DAVID C. SHONKA
Acting General Counsel

EVAN ROSE, Cal. Bar No. 253478
MATTHEW D. GOLD, N.Y. Bar No. 2073963
LAURA FREMONT, Cal. Bar No. 159670
ERIC EDMONDSON, D.C. Bar No. 450294
KERRY O'BRIEN, Cal. Bar No. 149264
DAVID M. NEWMAN, Cal. Bar No. 54218

Federal Trade Commission
901 Market Street, Suite 570
San Francisco, CA 94103

Email: erose@ftc.gov; mgold@ftc.gov; lfremont@ftc.gov;
eedmondson@ftc.gov; kobrien@ftc.gov; dnewman@ftc.gov
Tel: (415) 848-5100; Fax: (415) 848-5184

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
San Francisco Division

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>          Plaintiff,<br><br>               v.<br><br>AT&T MOBILITY LLC, a limited liability company,<br><br>          Defendant. | Case No. _____<br><br>**COMPLAINT FOR PERMANENT INJUNCTION AND OTHER EQUITABLE RELIEF** |

Plaintiff, the Federal Trade Commission ("Commission" or "FTC"), for its Complaint alleges:

1.     The FTC brings this action under Section 13(b) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 53(b), to obtain permanent injunctive relief, rescission or reformation of contracts, restitution, the refund of monies paid, disgorgement of ill-gotten

**COMPLAINT**

monies, and other equitable relief for Defendant's acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), in connection with the marketing of wireless broadband internet access service for smartphones.

## JURISDICTION AND VENUE

2. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345, and 15 U.S.C. §§ 45(a) and 53(b).

3. Venue is proper in this district under 28 U.S.C. §§ 1391(b)(1), (b)(2), (c)(2), and (d), and 15 U.S.C. § 53(b).

## INTRADISTRICT ASSIGNMENT

4. Defendant markets its products throughout the United States, including throughout the county of San Francisco.

## PLAINTIFF

5. The FTC is an independent agency of the United States Government created by statute. 15 U.S.C. §§ 41–58. The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce.

6. The FTC is authorized to initiate federal district court proceedings, by its own attorneys, to enjoin violations of the FTC Act and to secure such equitable relief as may be appropriate in each case, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies. 15 U.S.C. § 53(b).

## DEFENDANT

7. Defendant AT&T Mobility LLC is a Delaware limited liability company with its principal office or place of business at 1025 Lenox Park Boulevard NE, Atlanta, GA 30319. AT&T Mobility LLC transacts or has transacted business in this district and throughout the United States.

## COMMERCE

8. At all times material to this Complaint, Defendant has maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

**COMPLAINT**                                                                    **PAGE 2**

1

2

## DEFENDANT'S COURSE OF CONDUCT

### Defendant's Mobile Data Plans

3    9.    Defendant is a major retailer of smartphones and provider of wireless broadband

4    internet access service for smartphones ("mobile data").  Smartphone owners use mobile data to,

5    among other things, send and receive email, use GPS navigation, watch streaming video, and

6    browse the internet.

7    10.    In 2007, Defendant became the exclusive mobile data provider for the Apple

8    iPhone.  Initially, Defendant offered iPhone customers an "unlimited" mobile data plan for $20

9    per month.  In 2008, when the iPhone 3G was released, Defendant increased the fee for the

10   unlimited mobile data plan to $30 per month, and required all iPhone 3G customers to purchase

11   the data plan.  As Defendant began offering subsequent versions of the iPhone and smartphones

12   from competing manufacturers, it imposed a similar requirement on purchasers of those devices.

13   11.    In June 2010, Defendant ceased offering the unlimited mobile data plan to new

14   smartphone customers and, since then, has required new smartphone customers to purchase one

15   of Defendant's "tiered" mobile data plans.  Unlike the unlimited mobile data plan, Defendant's

16   tiered mobile data plans specify a data allowance (e.g., 250 MB, 3 GB), and customers who

17   exceed the stated data allowance are charged for the additional data at the rate set forth in the

18   tiered mobile data plan.

19   12.    By the time Defendant stopped offering the unlimited mobile data plan to new

20   customers, millions of customers had accepted Defendant's offer to purchase an unlimited

21   mobile data plan.  Since June 2010, Defendant has offered to grandfather these customers'

22   unlimited mobile data plan when they purchase a new smartphone, giving them the opportunity

23   to continue with their unlimited mobile data plan, rather than requiring them to switch to

24   Defendant's tiered mobile data plans.  The renewed plan continues to cost $30 per month.

25   13.    Defendant has offered to grandfather customers' existing unlimited mobile data

26   plan to induce customers who have this plan not to switch mobile data providers.  Competing

27   mobile data providers have offered data service for smartphones for several years, including,

28   since 2011, for the iPhone.

**COMPLAINT**                                                                              **PAGE 3**

14.     Defendant has communicated to existing customers the offer to renew their unlimited mobile data plan via in-store or telephone representatives or on Defendant's website. In response to this offer, millions of Defendant's unlimited mobile data plan customers have elected to keep their unlimited mobile data plan rather than switch to a tiered mobile data plan or obtain service from another provider.

**Defendant's Data Throttling Program**

15.     In July 2011, Defendant decided to begin reducing the data speed for unlimited mobile data plan customers, a practice commonly known as "data throttling."  Under Defendant's throttling program, if an unlimited mobile data plan customer exceeds the limit set by Defendant during a billing cycle, Defendant substantially reduces the speed at which the customer's device receives data for the rest of that customer's billing cycle.

16.     In October 2011, Defendant began restricting the data speed for unlimited mobile data plan customers whose data usage exceeded thresholds imposed by Defendant.  Initially, the data usage threshold at which Defendant throttled customers varied across geographic markets. The threshold was as low as 2 GB per billing cycle in dense markets like New York City and the San Francisco Bay Area.

17.     In March 2012, Defendant modified its data throttling program.  Under the revised version, Defendant set a uniform nationwide data usage threshold of 3 GB per billing cycle for devices using Defendant's 3G network (e.g., iPhone 3G, 3GS, 4) and HSPA+ network (e.g., iPhone 4S), and 5 GB per billing cycle for devices using Defendant's LTE network (e.g., iPhone 5, 5S, 6, 6 Plus).

18.     Under the original version of Defendant's throttling program, from October 2011 through February 2012, Defendant capped the data speed at 128 Kbps for customers who exceeded the data usage threshold.  Under the revised version, starting in March 2012 and continuing to the present, Defendant caps the data speed at 256 Kbps for customers with 3G and HSPA+ devices and 512 Kbps for customers with LTE devices.

19.     Typical unthrottled speeds on AT&T's network range from 700 Kbps to 1.7 Mbps for 3G devices, 2 to 6 Mbps for HSPA+ devices, and 5 to 12 Mbps for LTE devices.

20. Customers who have been throttled by Defendant have experienced drastically reduced service under both the original and revised versions of the throttling program. Numerous customers using 3G devices have experienced an 80–90% decrease in speed when throttled under the original version of Defendant's throttling program, and a 60–85% decrease under the revised version. Numerous customers using HSPA+ devices have experienced a 90–95% decrease in speed when throttled under the original version, and an 85–95% decrease under the revised version. Numerous customers using LTE devices have experienced a 95% decrease in speed when throttled under the original version, and a 90–95% decrease under the revised version. As a result, under both versions, many everyday applications, such as web browsing, GPS navigation, and streaming video, are significantly slower, and in some cases are severely impaired or rendered practically inoperable.

21. When it implemented its throttling program, Defendant possessed internal focus group research indicating that its throttling program was inconsistent with consumer understanding of an "unlimited" data plan. The researchers concluded that, "[a]s we'd expect, the reaction to [a proposed data throttling program] was negative; consumers felt 'unlimited should mean unlimited[.']" The focus group participants thought the idea was "clearly unfair." The researchers highlighted a consumer's comment that "[i]t seems a bit misleading to call it Unlimited." The researchers observed that "[t]he more consumers talked about it the more they didn't like it." This led the researchers to advise that "[s]aying less is more, [so] don't say too much" in marketing communications concerning such a program.

22. When it revised its throttling program, Defendant was aware of third-party research showing that, at 256 Kbps, two-thirds of customers are unsatisfied with webpage render time, and that, at 512 Kbps, one-third of customers are unsatisfied with render time. According to the same research, at 128 Kbps, 93% of customers are unsatisfied with webpage render time.

23. Thousands of customers have submitted written complaints concerning Defendant's throttling program to Defendant, the Better Business Bureau, and government agencies. In addition, Defendant has received more than 190,000 customer calls relating to its throttling program.

**COMPLAINT**                                                                                    **PAGE 5**

24.     Numerous complaining customers have accused Defendant of failing to live up to its end of their bargain because its throttling program imposes a limitation on their unlimited data plan.  The following excerpts are illustrative of the consumer complaints:

>    a.     "Unlimited means without restriction, [but] AT&T slowing the speed of data by 90% is RESTRICTING my data."

>    b.     "I would like AT&T to honor the contract that we signed up with that allowed us to continue our unlimited data plan . . . .  I would like the advertisement of 'Nation[']s fastest LTE Network' to be honored."

>    c.     "If [I'm] being punished for using my phone and plan as advertised[,] then I have lost a lot of respect for [AT&T]."

>    d.     "This is a clear case of bait and switch."

>    e.     "I have a 2–3 hour commute to my job and use [P]andora and YouTube. . . . I am losing money paying for Hulu, Netflix, and Pandora . . . because AT&T has changed the rules yet again . . . ."

25.     Many customers also have expressed their frustration at the effect Defendant's throttling program has on their ability to load webpages and to perform common functions they had come to rely on.  The following excerpts are illustrative of the consumer complaints:

>    a.     "When loading a page, it can take forever for it to load or it doesn't load at all. . . . When I needed to use the GPS when I am lost, I am unable [to] because they slowed down my data plan to the point that I am not able to use it to look up directions."

>    b.     "Recently, AT&T has . . . effectively slow[ed] my speed down to where I cannot listen to music during the day or stream video."

>    c.     "I'm no longer able to access basic functions, such as email or [F]acebook, because the [data] speed . . . does not allow these services to function."

>    d.     "Apps such as email, social media, calendar, word processing, streaming music, navigation, and data backup frequently stop working without the ability to reliably connect to the data network at a reasonable speed."

**COMPLAINT**                                                                              **PAGE 6**

e.      "My speed [has] been decreased from 50mbps to 0.5mbps! . . . I have to go to find [Wifi] to be able to post pictures, videos and use my device."

26.     The speed reductions and service restrictions in effect under Defendant's throttling program are not determined by real-time network congestion at a particular cell tower. Throttled customers are subject to this reduced speed even if they use their smartphone at a time when Defendant's network has ample capacity to carry the customers' data, or the use occurs in an area where the network is not congested.  Once customers have been throttled during a given billing cycle, Defendant caps their download speed until the end of the billing cycle, at which time Defendant restores the data speed for these customers to full speed.

27.     Since October 2011, Defendant has throttled its customers more than 25 million times, affecting more than 3.5 million unique customers.  When a customer is throttled, the customer's data speed is reduced, on average, for the last twelve days of the customer's thirty-day billing cycle.

28.     Defendant has numerous alternative ways to reduce data usage on its network that do not involve violating its promise to customers.  One alternative would involve Defendant requiring existing unlimited data customers to switch to a tiered data plan at renewal.  Defendant considered and rejected this approach in part because of concern that renewing customers would switch providers rather than switch to one of Defendant's tiered data plans.  Another alternative would involve Defendant introducing its throttling program at renewal, with disclosures at point of sale.  Defendant considered and rejected such an alternative, in part because it "[a]pplied to all customers" and would not let Defendant "isolat[e] communications to [the] heaviest users."  Yet other alternatives might include limited, narrowly tailored throttling programs that are consistent with Defendant's contracts, advertising, and other public disclosures.

29.     At the same time that Defendant has been throttling unlimited mobile data plan customers who exceed 3 or 5 GB of data usage during a billing cycle, Defendant has been offering individual tiered mobile data plans for data usage of at least 30 GB per billing cycle. Defendant does not throttle its tiered mobile data plan customers, regardless of the amount of data that a tiered mobile data plan customer uses.

**COMPLAINT**                                                                        **PAGE 7**

1

<u>**Defendant's Unlimited Mobile Data Plan Advertisements and Contracts**</u>

2       30.     Defendant has disseminated or has caused to be disseminated advertisements and

3 promotional materials for mobile data plans, including but not limited to the attached Exhibits A

4 to C. These advertisements and promotional materials contain the following statements:

5          a.     iPhone Brochure (Exhibit A)

6

7                iPhone combines three amazing products—a mobile phone, a widescreen iPod and a breakthrough Internet device—into one small, lightweight,

8                handheld device with rich HTML email, web browsing, searching and Google Maps.

9

               . . . .

10

**Breakthrough Internet Device**

11                iPhone offers a rich HTML email client and Safari—the most advanced web browser ever on a portable device. It automatically syncs bookmarks

12                from a PC or Mac and has built-in Google and Yahoo! Search. It also multitasks, so you can read a web page while downloading your email in

13                the background over Wi-Fi or EDGE.

14

               . . . .

15

**AT&T Plans for iPhone**

16                To use iPhone, you'll need to sign up for a 2-year service agreement or a renewed 2-year service agreement if you are already an AT&T customer.

17                Plans start at $59.99 and include Visual Voicemail, Unlimited Data (email

18                and web) and 200 SMS text messages—for use in the U.S. . . . You can

19                browse the Internet and send emails as often as you like without being charged extra.

20

21                . . . .

22

**Data Plans for iPhone** (U.S. Coverage Packages)

23                . . . A Data Plan for iPhone gives you Visual Voicemail, Unlimited Data (email and web) and SMS text messaging—for use in the U.S.

24

25          b.     iPhone 3G Brochure (Exhibit B)

26

27                Introducing iPhone 3G. With fast 3G wireless technology, Maps with GPS, support for enterprise features like Microsoft Exchange, and the new

28                App Store, iPhone 3G puts even more features at your fingertips. And like the original iPhone, it combines three products in one—a revolutionary

**COMPLAINT**                                                                **PAGE 8**

phone, a widescreen iPod, and a breakthrough Internet device with rich HTML email and full web browsing.  iPhone 3G.  It redefines what a mobile phone can do—again.

. . . .

**Internet In Your Pocket**
iPhone uses fast 3G and Wi-Fi wireless connections to deliver rich HTML email, Maps with GPS, and Safari—the most advanced web browser on a portable device.  iPhone automatically syncs bookmarks from your PC or Mac and has Google and Yahoo! search built in.  Since iPhone multitasks, you can even make a phone call while emailing a photo or surfing the web over a Wi-Fi or 3G connection.

**Maps with GPS**
Find your location, get directions, and search for nearby businesses—all from your phone.  Maps on iPhone 3G combines GPS, Wi-Fi, and cell tower location technology to create the best map application on a mobile phone.

. . . .

**AT&T Plans for iPhone 3G** (U.S. Coverage Packages)

AT&T Nation$^{SM}$

UNLIMITED Data (Email/Web) . . . .

. . . .

AT&T FamilyTalk$^{SM}$
*Includes 2 lines*

UNLIMITED Data (Email/Web) . . . .

    c.    iPhone 3GS Brochure (Exhibit C)

**AT&T Advantages**

**The Nation's Fastest 3G Network**

. . . .

**AT&T Nation$^{SM}$ for iPhone**
Unlimited Data, Unlimited Mobile to Mobile, Unlimited Nights & Weekends, Visual Voicemail and Rollover$^{®}$

**COMPLAINT**                                                                 **PAGE 9**

. . . .

**AT&T FamilyTalk^SM for iPhone (includes 2 lines)**
Unlimited Data, Unlimited Mobile to Mobile, Unlimited Nights &
Weekends, Visual Voicemail and Rollover^®

31.     Defendant's wireless customer agreements for unlimited mobile data plan customers prohibit the use of Defendant's data service for certain activities, such as operating a server, using peer-to-peer file-sharing services, sending spam email, and using data in a way that adversely impacts network or service levels or hinders access to the wireless network.  The agreements provide that Defendant may modify, deny, disconnect, or terminate the service of customers who use the service for such prohibited activities.  See, for example, Defendant's Wireless Customer Agreement for the period March 2008 to August 2012, attached as Exhibit D, at Section 6.2 ("What Are The Intended Purposes Of The Wireless Data Service?").

32.     Defendant's wireless customer agreements do not state that an unlimited mobile data plan customer's use of more than a specified amount of data is a prohibited activity.  Nor do the agreements provide that Defendant may modify, diminish, or impair the service of unlimited mobile data plan customers engaged in permissible activities if these customers use more than a specified amount of data.

33.     Defendant requires most customers with an unlimited mobile data plan, when purchasing a new smartphone, to enter into a contract with a long-term service commitment (typically lasting two years) in which customers who cancel service before the end of the service commitment must pay an early termination fee ("ETF"), typically in the hundreds of dollars.

34.     Defendant does not inform unlimited mobile data plan customers at renewal that their access to mobile data may be severely limited by Defendant's throttling program.

35.     The only information concerning Defendant's throttling program that Defendant sent to most customers prior to their renewal of their unlimited mobile data plan was a statement included in their July or August 2011 monthly bill.  The statement read as follows:

**Important Update for Unlimited Data Plan Customers**
To provide the best possible network experience, starting 10/01/11, smartphone

**COMPLAINT**                                                                                                    **PAGE 10**

customers with unlimited data plans whose usage is in the top 5% of users can still use unlimited data but may see reduced data speeds for the rest of their monthly billing cycle.  We'll alert you if you near the top 5%.  To avoid slowed speeds you may use Wi-Fi or choose a tiered data plan.  Details @ att.com/dataplans.

The statement failed to disclose the degree to which the customers' data speed would be reduced, and the impact that the reduced speed would have on customers' ability to use their device.  It also failed to adequately disclose that the speed reduction was due to a limit intentionally imposed by Defendant, as opposed to general network congestion.  Many unlimited mobile data plan customers have renewed their contract months, or even years, after this statement appeared in their bill.

36.     A minority of unlimited mobile data plan customers have received one or more text messages concerning Defendant's throttling program prior to renewing their unlimited mobile data plan.  Only those customers who approach or exceed the data usage threshold are sent a text message.  A subset of these customers also have been sent an email concerning Defendant's throttling program.  Most unlimited mobile data plan customers have never been sent a text message or email concerning Defendant's throttling program.

37.     Even those customers who are sent a text message or email concerning Defendant's throttling program prior to renewing their unlimited mobile data plan are not adequately informed of the throttling program.  The text messages and emails do not adequately disclose the limits that Defendant's throttling program imposes on their unlimited mobile data plan, and many customers renew their contract months, or even years, after Defendant sends such a text message or email.

38.     Many of Defendant's customers subscribe to family plans.  Family plans cover more than one wireless device and may share minutes and text messaging among those devices.  Each smartphone on a family plan is typically subject to a separate long-term service commitment with Defendant for the provision of mobile data.  Family plan customers who wish to cancel service for their family must pay an ETF for each smartphone on the plan that is currently subject to such a fee.

**COMPLAINT**                                                                                        **PAGE 11**

39.     Defendant throttles unlimited mobile data plan customers regardless of whether the customers' contract permits them to cancel without incurring a substantial ETF.

40.     Defendant has not given unlimited mobile data plan customers subject to Defendant's throttling program the opportunity to cancel their individual or family plans without incurring one or more substantial ETFs.

41.     Numerous unlimited mobile data plan customers have canceled their unlimited mobile data plans after being throttled by Defendant.

42.     Defendant has collected substantial ETFs from unlimited mobile data plan customers who cancelled service after being throttled.

## FTC ACT VIOLATIONS

43.     Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

44.     Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act.

## Count I

## Unfair Mobile Data Throttling Program

45.     In the advertising, sale, and renewal of mobile data plans, Defendant entered into numerous mobile data contracts that were advertised as providing access to unlimited mobile data, and that do not provide that Defendant may modify, diminish, or impair the service of customers who use more than a specified amount of data for permissible activities.

46.     While such contracts were in effect, Defendant imposed significant data speed restrictions on customers who used more than a fixed amount of data in a given billing cycle.

47.     Defendant's practice has caused or is likely to cause substantial injury to consumers that is not outweighed by countervailing benefits to consumers or competition and is not reasonably avoidable by consumers themselves.  This practice was, and is, an unfair act or practice.

\\
\\

**COMPLAINT**                                                                **PAGE 12**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## Count II

## Deceptive Failure to Disclose Mobile Data Throttling Program

48.     In the advertising, sale, and renewal of mobile data plans, Defendant has represented, directly or indirectly, expressly or by implication, to unlimited mobile data plan customers that the amount of data that the customer could access in any billing period would not be limited.

49.     Since August 2011, Defendant has failed to disclose, or has failed to disclose adequately, that it imposes significant and material data speed restrictions on unlimited mobile data plan customers who use more than a fixed amount of data in a given billing cycle.  The failure to disclose or adequately disclose this fact, in light of the representations made, was, and is, a deceptive act or practice.

## CONSUMER INJURY

50.     Consumers have suffered and will continue to suffer substantial injury as a result of Defendant's violations of the FTC Act.  In addition, Defendant has been unjustly enriched as a result of its unlawful acts or practices.  Absent injunctive relief by this Court, Defendant is likely to continue to injure consumers, reap unjust enrichment, and harm the public interest.

## THIS COURT'S POWER TO GRANT RELIEF

51.     Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), empowers this Court to grant injunctive and such other relief as the Court may deem appropriate to halt and redress violations of any provision of law enforced by the FTC.  The Court, in the exercise of its equitable jurisdiction, may award ancillary relief, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies, to prevent and remedy any violation of any provision of law enforced by the FTC.

## PRAYER FOR RELIEF

Wherefore, Plaintiff FTC, pursuant to Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), and the Court's own equitable powers, requests that the Court:

A.     Enter a permanent injunction to prevent future violations of the FTC Act by Defendant;

**COMPLAINT**                                                                              **PAGE 13**

1    B.    Award such relief as the Court finds necessary to redress injury to consumers

2  resulting from Defendant's violations of the FTC Act, including but not limited to rescission or

3  reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-

4  gotten monies; and

5    C.    Award Plaintiff the costs of bringing this action, as well as such other and

6  additional relief as the Court may determine to be just and proper.

7    Dated: Oct. 28, 2014          Respectfully submitted,

8                                  DAVID C. SHONKA
9                                  Acting General Counsel

10

11    _____
      EVAN ROSE
12    MATTHEW D. GOLD
      LAURA FREMONT
13    ERIC EDMONDSON
      KERRY O'BRIEN
14    DAVID M. NEWMAN

15
                                  Attorneys for Plaintiff
16                                FEDERAL TRADE COMMISSION

17

18

19

20

21

22

23

24

25

26

27

28

**COMPLAINT**                                          **PAGE 14**