1    KELLOGG, HUBER, HANSEN, TODD,
      EVANS & FIGEL, P.L.L.C.
2    Michael K. Kellogg (*pro hac vice*)
      Mark C. Hansen (*pro hac vice*)
3    Email: mkellogg@khhte.com
            mhansen@khhte.com
4    1615 M Street, N.W., Suite 400
      Washington, D.C. 20036
5    Telephone: (202) 326-7900
      Facsimile: (202) 326-7999
6
      CROWELL & MORING LLP
7    Douglas W. Sullivan (SB No. 0088136)
      275 Battery Street, 23rd Floor
8    San Francisco, CA 94111
      Telephone:  (415) 986-2800
9    Facsimile:  (415) 986-2827

10   Attorneys for Defendant
      AT&T MOBILITY, LLC
11

12                   UNITED STATES DISTRICT COURT

13          FOR THE NORTHERN DISTRICT OF CALIFORNIA
                     San Francisco Division
14

15   FEDERAL TRADE COMMISSION,        Case No. 14-CV-04785-EMC

16             Plaintiff,               **MOTION TO DISMISS BY DEFENDANT**
                                          **AT&T MOBILITY, LLC**
17         v.
                                      Hearing Date:  March 12, 2015
18   AT&T MOBILITY LLC, a limited liability     Time:          1:30 p.m.
      company,                               Judge:        Hon. Edward M. Chen
19
20             Defendant.

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ....................................................................................................... ii

NOTICE OF MOTION AND STATEMENT OF RELIEF SOUGHT ......................................... 1

MEMORANDUM OF POINTS AND AUTHORITIES ............................................................... 1

STATEMENT OF THE ISSUE .................................................................................................... 1

INTRODUCTION ........................................................................................................................ 1

FACTUAL BACKGROUND ....................................................................................................... 3

A.  AT&T's MBR Program ................................................................................................. 3

B.  AT&T's Common-Carrier Status .................................................................................. 5

C.  The FCC's MBR Inquiry ............................................................................................... 8

D.  The FTC Complaint ....................................................................................................... 8

ARGUMENT ................................................................................................................................ 9

I.  AT&T Is Exempt from Section 5 of the FTC Act Because It Is a
Common Carrier Subject to the Communications Act ................................................... 9

II.  The Case Law Is Consistent on the Meaning of the Exemption ................................... 12

III.  Mobile Broadband Data Service Is Already Subject to FCC
Regulation ..................................................................................................................... 14

IV.  The FTC Cannot Rewrite the Statute To Expand Its Own Jurisdiction ........................ 15

CONCLUSION .......................................................................................................................... 17

1

## TABLE OF AUTHORITIES

Page

2

**CASES**

3

*Action for Children's Television v. FCC*, 59 F.3d 1249 (D.C. Cir. 1995) ................................... 15

4

*American Bankers Ass'n v. SEC*, 804 F.2d 739 (D.C. Cir. 1986)................................................. 17

5

*Cellco P'ship v. FCC*, 700 F.3d 534 (D.C. Cir. 2012).................................................................... 5

6

*City of Arlington v. FCC*, 133 S. Ct. 1863 (2013) ........................................................................ 16

7

*Comtronics, Inc. v. Puerto Rico Tel. Co.*, 553 F.2d 701 (1st Cir. 1977) ................................... 15

8

*FTC v. American Standard Credit Sys., Inc.*, 874 F. Supp. 1080 (C.D. Cal. 1994) .................... 13

9

*FTC v. CompuCredit Corp.*, No. 1:08-CV-1976-BBM-RGV, 2008 WL 8762850
    (N.D. Ga. Oct. 8, 2008) ........................................................................................................... 13

10

*FTC v. Miller*, 549 F.2d 452 (7th Cir. 1977) ............................................................... 2, 10, 12, 13

11

*FTC v. Saja*, No. Civ-97-0666-PHX-SMM, 1997 WL 703399
    (D. Ariz. Oct. 7, 1997) ........................................................................................................... 13

12

13

*FTC v. Verity Int'l, Ltd.*:

14

        194 F. Supp. 2d 270 (S.D.N.Y. 2002)................................................................................. 14

15

        443 F.3d 48 (2d Cir. 2006)........................................................................................... 12, 14

16

*Louisiana Pub. Serv. Comm'n v. FCC*, 476 U.S. 355 (1986) ...................................................... 17

17

*National Fed'n of Blind v. FTC*, 303 F. Supp. 2d 707 (D. Md. 2004), *aff'd*, 420 F.3d
    331 (4th Cir. 2005) ................................................................................................................. 13

18

*Official Airline Guides, Inc. v. FTC*, 630 F.2d 920 (2d Cir. 1980)............................................. 13

19

*Progressive Cellular III B-3 v. FCC*, 986 F.2d 546 (D.C. Cir. 1993) ........................................ 15

20

*Russello v. United States*, 464 U.S. 16 (1983) ....................................................................... 11-12

21

*Shook v. D.C. Fin. Responsibility & Mgmt. Assistance Auth.*, 132 F.3d 775 (D.C. Cir.
    1998) ....................................................................................................................................... 16

22

23

*Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004)........................................................................... 11

24

*Textile & Apparel Grp., Am. Importers Ass'n v. FTC*, 410 F.2d 1052
    (D.C. Cir. 1969) ...................................................................................................................... 16

25

*United States v. Southwestern Cable Co.*, 392 U.S. 157 (1968)................................................. 12

26

*United States v. Stevenson*, 215 U.S. 190, 198 (1909) ............................................................... 11

27

*Verizon v. FCC*, 740 F.3d 623 (D.C. Cir. 2014) ....................................................................... 6, 7

28

1

## STATUTES, REGULATIONS, AND RULES

2

Amendments to Packers and Stockyards Act of 1921, Pub. L. No. 85-909, § 3,
72 Stat. 1749 (1958) ................................................................................................. 11

3

4

Communications Act of 1934, 47 U.S.C. § 151 *et seq.*:

5

§ 151 ...................................................................................................................5, 12

6

§ 153(11) .............................................................................................................. 1, 5

7

§ 201 *et seq.* ............................................................................................................. 5

8

§ 332 ......................................................................................................................... 5

9

§ 332(c)(1) ........................................................................................................... 1, 5

10

§ 503(b) ................................................................................................................... 15

11

§ 1302 ....................................................................................................................... 6

12

Federal Trade Commission Act of 1914, § 5, 38 Stat. 717 .................................... *passim*

13

Packers and Stockyards Act of 1921, 42 Stat. 159 ............................................. 10, 11

14

Telecommunications Act of 1996, Pub. L. No. 104-104, § 706, 110 Stat. 56 ...................... 6, 7, 14

15

Wheeler-Lea Act, Pub. L. No. 75-447, § 3, 52 Stat. 111 (1938) ........................... 10, 11

16

15 U.S.C. § 44 ...................................................................................................... 1, 9

17

15 U.S.C. § 45 ........................................................................................................... 8

18

15 U.S.C. § 45(a) ...................................................................................................... 9

19

15 U.S.C. § 45(a)(2) ...................................................................................... 1, 9, 10, 11

20

15 U.S.C. § 53(b) ...................................................................................................... 9

21

28 U.S.C. § 1331 ....................................................................................................... 9

22

28 U.S.C. §1337(a) .................................................................................................... 9

23

28 U.S.C. § 1345 ....................................................................................................... 9

24

47 C.F.R. § 8.3 ........................................................................................................... 7

25

47 C.F.R. § 8.5 (2013) .............................................................................................. 6

26

Fed. R. Civ. P. 12(b)(1) ..................................................................................... 1, 17

27

28

---

**ADMINISTRATIVE MATERIALS**

Declaratory Ruling, *Appropriate Regulatory Treatment for Broadband Access to the Internet Over Wireless Networks*, 22 FCC Rcd 5901 (2007)........................................ 5

"Neutral on Internet Neutrality:  Should There Be a Role for the Federal Trade Commission?," Remarks of J. Thomas Rosch, Commissioner, FTC, Before the Global Forum 2011:  Vision for the Digital Future (Nov. 7, 2011), *available at* http://www.ftc.gov/sites/default/files/documents/ public_statements/neutral-internet-neutrality-should-there-be-role-federal-trade-commission/111107globalforum.pdf ........................................... 16

Order, *LabMD, Inc.*, No. 9357, 2014 WL 253518 (F.T.C. Jan. 16, 2014) ................................... 14

Report and Order, *Preserving the Open Internet*, 25 FCC Rcd 17905 (2010), *vacated in part*, *Verizon v. FCC*, 740 F.3d 623 (D.C. Cir. 2014)................. 2, 6, 7, 14, 15

Report and Order and Further Notice of Proposed Rulemaking, *Reexamination of Roaming Obligations of Commercial Mobile Radio Service Providers*, 22 FCC Rcd 15817 (2007) .................................................................................. 5

**LEGISLATIVE MATERIALS**

*FTC Reauthorization:  Hearing Before the Subcomm. on Consumer Affairs, Foreign Commerce and Tourism of the S. Comm. on Commerce, Science, and Transportation*, 107th Cong. 27-28 (2002), *available at* http://www. gpo.gov/fdsys/pkg/CHRG-107shrg91729/pdf/CHRG-107shrg91729.pdf ...................... 16

H.R. Rep. No. 85-1048 (1957) ................................................................... 11

Prepared Statement of the Federal Trade Commission, Before the Subcomm. on Commerce, Trade and Consumer Protection of the H. Comm. on Energy and Commerce, United States House of Representatives, 2003 WL 21353573 (June 11, 2003)........................................................................... 16

*To Amend the Federal Trade Commission Act:  Hearing on H.R. 3143 Before the H. Comm. on Interstate and Foreign Commerce*, 75th Cong. 23 (1937) .................. 10, 11

**OTHER MATERIALS**

AT&T, Broadband Information – Information About the Network Practices, Performance Characteristics & Commercial Terms of AT&T's Mass Market Broadband Internet Access Services, http://www.att.com/broadbandinfo ................................................................ 7

AT&T, Info for Smartphone Customers with Unlimited Data Plans, http://www.att.com/datainfo ........................................................................ 7

Katy Bachman & Brooks Boliek, *FTC, FCC Jostling Over Telecom Turf*, Politico Pro (Oct. 30, 2014), *available with registration at* http://www.politicopro.com/story/tech/?id=40104 ........................................ 15

---

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Br. for Appellee/Respondents, *Verizon v. FCC*, No. 11-1355, 2012 WL 3962421
(D.C. Cir. filed Sept. 10, 2012) ......................................................................5-6

Br. for the FTC in Opp., *Verity Int'l, Ltd. v. FTC*, No. 06-669 (U.S. filed Feb. 15,
2007), *available at* http://www.justice.gov/osg/briefs/2006/
0responses/2006-0669.resp.pdf................................................................... 14

*Letters to Big Four Wireless Carriers Probe Intersection of Business,
Engineering Practices, FCC Says*, Comm. Daily (Aug. 12, 2014) ................................... 2

Press Release, AT&T, An Update for our Smartphone Customers with Unlimited
Data Plans (July 29, 2011), *available at* http://www.att.com/gen/press-
room?pid=20535&cdvn=news& newsarticleid=32318 ...................................................... 4

Jeff Roberts, *Why a DC turf war may have played a part in the timing of the
FTC's mobile data lawsuit against AT&T*, Gigaom (Oct. 28, 2014),
https://gigaom.com/2014/10/28/why-a-dc-turf-war-may-have-played-a-
part-in-the-timing-of-the-ftcs-mobile-data-lawsuit-against-att......................................... 15

2A Norman J. Singer, *Statutes and Statutory Construction* (7th ed. 2013)................................... 11

---

1

**NOTICE OF MOTION AND STATEMENT OF RELIEF SOUGHT**

2

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:  Please take notice that

3

AT&T Mobility, LLC ("AT&T") hereby files this motion to dismiss the Federal Trade

4

Commission's ("FTC") complaint.  The motion will be heard on Thursday, March 12, 2015, at

5

1:30 p.m., before the Honorable Edward M. Chen.

6

Defendant AT&T seeks dismissal of the FTC's complaint.

7

**MEMORANDUM OF POINTS AND AUTHORITIES**

8

**STATEMENT OF THE ISSUE**

9

Whether this Court possesses subject-matter jurisdiction over the FTC's complaint,

10

notwithstanding the fact that 15 U.S.C. § 45(a)(2) deprives the FTC of regulatory jurisdiction over

11

"common carriers subject to the Acts to regulate commerce."

12

**INTRODUCTION**

13

Pursuant to Federal Rule of Civil Procedure 12(b)(1), AT&T respectfully requests that the

14

Court dismiss the complaint because the FTC lacks authority to bring suit against AT&T.  Section

15

5 of the Federal Trade Commission Act of 1914 ("FTC Act") exempts from the Act's coverage all

16

"common carriers subject to" the Communications Act of 1934 ("Communications Act"), 47

17

U.S.C. § 151 *et seq.  See* 15 U.S.C. § 45(a)(2); *id.* § 44.  This "common-carrier exemption" is

18

designed to ensure that entities already subject to another agency's regulatory authority will not

19

face potentially inconsistent regulation under the more general terms of the FTC Act.  AT&T is a

20

"common carrier[ ] subject to" the Communications Act because it offers its mobile voice plans to

21

customers on an indiscriminate basis without modifying the content of the information that

22

traverses its network.  *See* 47 U.S.C. §§ 153(11), 332(c)(1).  Accordingly, AT&T is not subject to

23

the FTC's enforcement authority under Section 5.

24

Despite AT&T's status as a common carrier, the FTC has asserted jurisdiction on the

25

ground that the exemption does not apply to AT&T's mobile *data* services, which are not treated

26

as common carriage.  This interpretation of the statute, however, is incorrect.  As various courts

27

have held, and as the text, structure, and history of the FTC Act make clear, the relevant exemption

28

1  in Section 5 focuses on the *status* of the regulated entity, not the particular activity in which it is

2  engaged.  *See*, *e.g.*, *FTC v. Miller*, 549 F.2d 452, 455 (7th Cir. 1977).  Indeed, the FTC itself has

3  recognized that, as drafted, the exemption altogether removes common carriers such as AT&T

4  from its jurisdiction and has asked Congress to modify the statute.  So far, Congress has refused.

5      In any event, the mobile data activities that the FTC is seeking to regulate are already

6  subject to regulation by the Federal Communications Commission ("FCC").  At issue here is

7  AT&T's "maximum bit rate" ("MBR") program, which is sometimes known as "throttling"

8  because it temporarily reduces the speed of mobile data consumption after users reach certain

9  monthly thresholds.  AT&T implemented this network management program to preserve a high-

10 quality experience for all of its customers, by preventing heavy users of data from overwhelming

11 the mobile network and degrading service for all.  It did so after the FCC identified throttling as a

12 type of network management that may be implemented consistent with the FCC's Open Internet

13 principles and rules.  *See Open Internet Order*[1] ¶ 73.  The FCC also imposed a transparency rule,

14 which requires providers of mobile broadband services to make certain public disclosures of their

15 network management practices, including throttling.  *See id.* ¶¶ 53, 97.

16     Last summer, in a letter from its Chairman, the FCC sought from AT&T an explanation of

17 how AT&T's MBR program complies with the FCC's Open Internet rules.[2]  Thereafter, the FCC

18 sent a more detailed Letter of Inquiry to AT&T about its MBR program, to which AT&T provided

19

20

21 _____

22 [1] Report and Order, *Preserving the Open Internet*, 25 FCC Rcd 17905, ¶ 73 (2010) ("*Open Internet Order*") ("For example, during periods of congestion a broadband provider could provide more bandwidth to subscribers that have used the network less over some preceding period of time than to heavier users."), *vacated in part on other grounds*, *Verizon v. FCC*, 740 F.3d 623 (D.C. Cir. 2014).

24 [2] Letter from Tom Wheeler, Chairman, FCC, to Ralph de la Vega, President and CEO, AT&T Mobility (Aug. 6, 2014), attached hereto as Exhibit 1.  Similar letters were sent to the other three major wireless carriers regarding comparable programs at those firms.  *See Letters to Big Four Wireless Carriers Probe Intersection of Business, Engineering Practices, FCC Says*, Comm. Daily (Aug. 12, 2014).  AT&T responded to Chairman Wheeler's letter on September 5, 2014.  *See* Letter from Robert W. Quinn, Senior Vice President, Federal Regulatory, AT&T, to Tom Wheeler, Chairman, FCC [hereinafter Quinn Letter], attached hereto as Exhibit 2.

28

1  an extensive response.[3]  The FCC's Enforcement Bureau is now actively considering whether to

2  issue a Notice of Apparent Liability against AT&T alleging that AT&T's public disclosures of its

3  MBR program failed to satisfy the FCC's transparency rule and proposing statutory forfeitures.

4       The FTC seeks to litigate the very same issues in an inappropriate parallel proceeding.  It

5  asserts in this lawsuit that AT&T's imposition of MBR was unfair and that its disclosures were

6  inadequate.  But whether AT&T's network management program is "unfair" and whether its

7  disclosures were "inadequate" are issues for the FCC to decide, and in fact the FCC is in the

8  process of so deciding, just as Congress intended.  Congress drafted Section 5 to avoid subjecting

9  common carriers like AT&T to precisely this sort of conflicting authority of separate federal

10  agencies over the same conduct.  Applying the exemption in this case is thus particularly

11  appropriate because the FTC's assertion of jurisdiction would contravene the essential purpose of

12  the exemption – to avoid overlapping regulatory jurisdiction.

13  **FACTUAL BACKGROUND**

14  **A.      AT&T's MBR Program**

15       AT&T is a retail provider of mobile telephone service that offers "the largest digital voice

16  and data network in America."  Compl. ¶ 9 & Ex. A-1.  AT&T's mobile wireless customers may

17  select voice service alone, or both voice and data service in a single plan.  *See id.*, Ex. A-2.

18  Customers who subscribe to AT&T's data services may browse the Internet, send and receive

19  email, and utilize various other applications by using their smartphones to access AT&T's

20  wireless network.  *See id.* ¶ 9 & Ex. A-1.  From 2007 to 2010, in conjunction with its voice

21  service, AT&T offered service plans that allowed its wireless customers to use unlimited data for a

22  fixed monthly price.  *See id.* ¶ 10 & Ex. A-1.  In all of its customer contracts, however, AT&T

23  reserved the right to limit or terminate wireless service if a customer's use "adversely impacts

24

25

26

27       [3] Letter from Theresa Z. Cavanaugh, Chief, Investigations and Hearings Div., Enforcement Bureau, FCC, to Jackie Flemming, AT&T (Oct. 28, 2014) [hereinafter Letter of Inquiry], attached hereto as Exhibit 3.

28

1   [AT&T's] wireless network," and to "protect its wireless network from harm," even where those

2   protective steps "may impact legitimate data flows."[4]

3        Following the introduction of the iPhone – and particularly following the launch of the

4   iPhone 3G in 2008 – data consumption on AT&T's mobile network exploded.  Basic broadband

5   transmissions such as corporate email were replaced by new "apps" that enabled rich web

6   browsing, turn-by-turn navigation, and streaming video.  This revolution caused data usage on

7   AT&T's network to increase *20,000 percent* between 2007 and 2011.  Quinn Letter at 2.  In the

8   face of this overwhelming growth, AT&T discontinued its Unlimited Data plans in June 2010 for

9   new customers, but offered to grandfather existing customers so that they could continue their

10   Unlimited Data plans going forward.  *See* Compl. ¶¶ 11-12.

11        Even after AT&T discontinued Unlimited Data plans prospectively, a small percentage of

12   grandfathered Unlimited Data plan customers continued to consume a disproportionate amount of

13   capacity on AT&T's network.  To address this ongoing resource challenge, AT&T announced its

14   MBR program in a July 2011 press release and implemented it three months later.  *See id.* ¶ 15;

15   Press Release, AT&T, An Update for our Smartphone Customers with Unlimited Data Plans (July

16   29, 2011), *available at* http://www.att.com/gen/press-room?pid=20535&cdvn=news&

17   newsarticleid=32318.  At first, AT&T temporarily reduced download speeds for those Unlimited

18   Data plan customers whose data consumption placed them in the top 5 percent of data-usage

19   customers in a given month.  *See* Compl. ¶¶ 15-16, 35.  In March 2012, AT&T modified the

20   program to reduce download speeds for any Unlimited Data plan customer whose data

21   consumption exceeded a fixed monthly threshold, and announced this change to its customers.

22   *See id.* ¶ 17.  And, as of late June 2014, AT&T further refined the program for customers on its

23   third-generation network so that download speeds would be reduced for the heavy data users only

24       [4] June 2007 Terms and Conditions; March 2008 Terms and Conditions; September 2010

25   Wireless Customer Agreement ("WCA"), § 6.2; *see also*, *e.g.*, June 2007 Terms and Conditions
    (reserving the right to "limit throughput or amount of data transferred"); March 2008 Terms and

26   Conditions (reserving the right to "modify" or "disconnect" service of users "whose usage adversely
    impacts [AT&T's] wireless network including . . . after sessions of excessive usage"); August 2012

27   WCA § 6.2 (stating that "AT&T may engage in any reasonable network management practice . . . to
    reduce network congestion," including the reduction of data throughput speeds).

28

1    where such usage occurs in a congested area.  Quinn Letter at 4.  Once a customer leaves the area,

2    or the congestion subsides, the customer's experience returns to normal.

3    **B.     AT&T's Common-Carrier Status**

4              At all relevant times, AT&T generally, and its network management and disclosure

5    practices specifically, have been subject to regulation by the FCC, the regulatory agency created

6    by the Communications Act of 1934 to "regulat[e] interstate and foreign commerce in

7    communication by wire and radio."  47 U.S.C. § 151.  The Communications Act includes

8    provisions – collected in Title II – that are specifically applicable to "common carriers."  *See*

9    *generally id.* § 201 *et seq.*[5]  Because AT&T is a provider of "commercial mobile service," the

10   Communications Act treats AT&T as a common carrier.  *See id.* § 332(c)(1).  The FCC reached

11   that conclusion explicitly in the *Broadband Classification Order*,[6] stating that a provider of

12   "traditional mobile voice service . . . is to be treated as a common carrier for the

13   telecommunications services it provides."  *Broadband Classification Order* ¶ 50; *see also Cellco*

14   *P'ship v. FCC*, 700 F.3d 534, 538 (D.C. Cir. 2012) ("mobile-voice providers are considered

15   common carriers") (emphasis omitted); *Roaming Obligations Order*[7] ¶ 1 ("clarify[ing]" the

16   "common carrier obligation[s]" of mobile voice service providers).

17            The FCC classified mobile *data* services in the same order as "private mobile services,"

18   which are not subject to common-carrier services treatment under Title II of the Act.  *See*

19   *Broadband Classification Order* ¶¶ 37-41 (citing § 332).  But the FCC has nonetheless asserted

20   "plenary authority" over wireless data providers under Title III of the Act, which governs wireless

21   services generally.  Br. for Appellee/Respondents at 20, 44, *Verizon v. FCC*, No. 11-1355, 2012

22   _____

23            [5] The Communications Act defines a "common carrier" as "any person engaged as a
     common carrier for hire, in interstate or foreign communication by wire or radio or interstate or
24   foreign radio transmission of energy, except where reference is made to common carriers not
     subject to this chapter."  47 U.S.C. § 153(11).

25            [6] Declaratory Ruling, *Appropriate Regulatory Treatment for Broadband Access to the*
     *Internet Over Wireless Networks*, 22 FCC Rcd 5901 (2007) ("*Broadband Classification Order*").
26
             [7] Report and Order and Further Notice of Proposed Rulemaking, *Reexamination of Roaming*
27   *Obligations of Commercial Mobile Radio Service Providers*, 22 FCC Rcd 15817 (2007) ("*Roaming*
     *Obligations Order*").

28

MOTION TO DISMISS BY DEFENDANT AT&T MOBILITY, LLC          CASE NO. 14-CV-04785-EMC
                                                                         PAGE 5

1  WL 3962421 (D.C. Cir. filed Sept. 10, 2012).  Section 706 of the Telecommunications Act of

2  1996 provides the FCC with the additional regulatory authority to promote advanced

3  telecommunications capability, including wireless data.  *See* 47 U.S.C. § 1302; *Verizon v. FCC*,

4  740 F.3d 623, 636-42 (D.C. Cir. 2014).

5      The FCC's Open Internet regulations governing mobile data services were adopted in

6  2010, and applied, *inter alia*, to network management practices aimed at "reducing or mitigating

7  the effects of congestion on the network." *Open Internet Order* ¶ 82.  In the *Open Internet Order*,

8  the FCC established an anti-blocking rule that precluded AT&T and other mobile carriers from

9  preventing their customers from accessing lawful websites on their mobile devices and from

10 blocking certain applications that compete with their own services.[8]  At the same time, the FCC

11 established a regime of "reasonable" and flexible network management that allowed AT&T and

12 other carriers to manage their networks so as to avoid network congestion resulting from excessive

13 data usage:

14  - The FCC recognized the need for "reasonable network management" programs because
       "existing mobile networks present operational constraints that fixed broadband networks do
15     not typically encounter." *Open Internet Order* ¶ 95.

16  - The FCC concluded that "congestion management may be a legitimate network
       management purpose" and that "broadband providers may need to take reasonable steps to
17     ensure that heavy users do not crowd out others." *Id.* ¶ 91.

18  - The FCC found that a wireless carrier's efforts "to . . . reduce or mitigate the effects of
       congestion on its network or to address quality-of-service concerns" are reasonable
19     practices. *Id.* ¶ 81.

20  - The FCC approved the network management policy of providing "more bandwidth to
       subscribers that have used the network less over some preceding period of time than to
21     heavier users" to reduce congestion.  *Id.* ¶ 73.

22      The *Open Internet Order* also imposed transparency and disclosure regulations "applicable

23 to all mobile broadband providers" designed to "ensur[e] that end users have sufficient

24 information to make informed choices regarding use of the network."  *Id.* ¶ 97; *see id.* ¶ 53

25 (requiring "[e]ffective disclosure of broadband providers' network management practices and the

26 performance and commercial terms of their services," for both wireline and wireless access to the

27

        [8] *See* 47 C.F.R. § 8.5 (2013).

28

---

Internet).  The FCC's rule thus allowed certain specific network management techniques while

also imposing disclosure requirements.[9]  The *Open Internet Order* provides further specificity:

- Mobile broadband providers must "clearly explain their criteria for any restrictions on use of their network[s]," including any "congestion management practices," the "types of traffic subject to practices," the "purposes served by [those] practices," the "criteria used in [those] practices, such as indicators of congestion that trigger a practice," the "usage limits and consequences of exceeding them," and "references to engineering standards, where appropriate."  *Open Internet Order* ¶¶ 56, 98.

- Mobile broadband providers must "prominently display or provide links to disclosures on a publicly available, easily accessible website that is available to current and prospective end users."  *Id.* ¶ 57.

- Any "relevant information" regarding broadband providers' network management practices – including congestion management practices – must be disclosed "at the point of sale."  *Id.*

In its ruling on the FCC's *Open Internet Order*, the D.C. Circuit upheld the FCC's authority to

impose network management rules on broadband data services under Section 706, left undisturbed

the FCC's finding that MBR-type programs constitute reasonable network management, and

upheld the FCC's transparency rule – the very issues that, as discussed below, the FTC is seeking

to regulate here.  *See Verizon v. FCC*, 740 F.3d at 637, 659.  The anti-blocking rule was vacated.

*Id.* at 659.

    In November 2011, concurrent with its implementation of MBR, AT&T complied with the

FCC's notice requirements by setting forth on its website the mandated disclosures concerning its

network management practices for mobile data.  *See Open Internet Order* ¶ 57.[10]  And AT&T took

the further step of disclosing its congestion management practices to Unlimited Data plan

customers through a second webpage devoted to explaining its MBR program.[11]

---

[9] The FCC's rule states that "[a] person engaged in the provision of broadband Internet access service shall publicly disclose accurate information regarding the network management practices, performance and commercial terms of its broadband Internet access services sufficient for consumers to make informed choices."  47 C.F.R. § 8.1.

[10] *See, e.g.*, AT&T, Broadband Information – Information About the Network Practices, Performance Characteristics & Commercial Terms of AT&T's Mass Market Broadband Internet Access Services, http://www.att.com/broadbandinfo (describing AT&T's "Network Practices" with respect to wired and mobile services, including its "process to reduce the data throughput speed experienced by a very small minority of smartphone customers who are on unlimited plans").

[11] AT&T, Info for Smartphone Customers with Unlimited Data Plans, http://www.att.com/datainfo.

1

### C.    The FCC's MBR Inquiry

2

On August 6, 2014, the Chairman of the FCC sent a letter to the President of AT&T

3    Mobility asking about AT&T's MBR program.  The Chairman listed two issues for which he

4    wanted responses.  First, he asked for the rationale for treating customers differently in terms of

5    speed reductions based on the plan to which they subscribe, and whether that treatment was

6    consistent with the FCC's network management rules.  Second, he wanted an explanation of

7    whether the MBR program complies with the transparency requirements of the Open Internet

8    rules.  The other three major wireless carriers received similar letters.[12]  AT&T sent a detailed

9    response to the Chairman's letter on September 5, 2014.[13]

10

Thereafter, on October 28, 2014, the Chief of the Investigations and Hearings Division of

11   the FCC's Enforcement Bureau sent an official Letter of Inquiry to AT&T requesting extensive

12   documents and detailed information about AT&T's MBR program.  The stated purpose of the

13   inquiry was to determine whether the MBR program "may have violated" the Commission's Open

14   Internet rules, including the public-disclosure requirements pertaining to network management

15   practices.  Letter of Inquiry at 1.  AT&T provided the documents and a detailed response to the

16   questions on November 10, 2014, and, as noted, the FCC is now actively considering issuing a

17   Notice of Apparent Liability against, and seeking a statutory forfeiture from, AT&T.

18   ### D.    The FTC Complaint

19

On the same day that the FCC issued its Letter of Inquiry to AT&T, the FTC filed suit

20   against AT&T based on its MBR program.  The complaint sets forth two counts under Section 5

21   of the FTC Act, 15 U.S.C. § 45.  The first count – for "Unfair Mobile Data Throttling Program" –

22   asserts that, notwithstanding "mobile data contracts that were advertised as providing access to

23   unlimited mobile data," AT&T "imposed significant data speed restrictions on customers who

24   used more than a fixed amount of data in a given billing cycle."  Compl. ¶¶ 45-46.  The second

25   count, entitled "Deceptive Failure to Disclose Mobile Data Throttling Program," asserts that

26

---

27

[12] *See supra* note 2.

[13] *See* Quinn Letter.

28

---

AT&T has "represented, directly or indirectly, expressly or by implication," that "the amount of data that [unlimited data customers] could access in any billing period would not be limited," and that, "[s]ince August 2011, Defendant has failed to disclose, or has failed to disclose adequately, that it imposes significant and material data speed restrictions on unlimited mobile data plan customers who use more than a fixed amount of data in a given billing cycle." *Id.* ¶¶ 48-49.  The complaint claims subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345, and 15 U.S.C. §§ 45(a) and 53(b).  *Id.* ¶ 2.

## ARGUMENT

**I.   AT&T Is Exempt from Section 5 of the FTC Act Because It Is a Common Carrier Subject to the Communications Act**

The FTC lacks jurisdiction to prosecute this action because AT&T is a common carrier subject to the Communications Act and therefore outside the FTC's authority under Section 5 of the FTC Act.  15 U.S.C. § 45(a)(2).  Section 45(a)(2) states:

> The [FTC] is hereby empowered and directed to prevent persons, partnerships, or corporations, ***except*** banks, savings and loan institutions described in section 57a(f)(3) of this title, Federal credit unions described in section 57a(f)(4) of this title, ***common carriers subject to the Acts to regulate commerce***, air carriers and foreign air carriers subject to part A of subtitle VII of title 49, and persons, partnerships, or corporations insofar as they are subject to the Packers and Stockyards Act, 1921, as amended [7 U.S.C. 181 et seq.], except as provided in section 406(b) of said Act [7 U.S.C. 227 (b)], from using unfair methods of competition in or affecting commerce and unfair or deceptive acts or practices in or affecting commerce.

*Id.* (emphases added; first set of brackets added).  The FTC Act specifically defines "'Acts to regulate commerce'" to include "the Communications Act of 1934 [47 U.S.C. § 151 *et seq.*] and all Acts amendatory thereof and supplementary thereto."  15 U.S.C. § 44.  AT&T plainly qualifies as a "common carrier" for purposes of Section 5 because it provides mobile voice services subject to common-carrier regulation under Title II of the Communications Act.

The fact that AT&T's mobile *data* services are not regulated as common-carrier services under the Communications Act is irrelevant.  The text, structure, history, and purpose of Section 5 leave no doubt that its common-carrier exemption turns on an entity's "*status* as a common carrier

1   subject to [an Act to regulate commerce]," not its "*activities* subject to regulation under that Act."

2   *FTC v. Miller*, 549 F.2d 452, 455 (7th Cir. 1977) (emphases added).

3       Thus, Section 5 defines the FTC's jurisdiction in terms of specific entities – namely,

4   "persons, partnerships, or corporations."  15 U.S.C. § 45(a)(2).  Among such "persons . . . or

5   corporations," Congress exempted "banks, savings and loan institutions described in Section

6   57a(f)(3) of this title," "Federal credit unions described in section 57a(f)(4) of this title,"

7   "common carriers subject to the Acts to regulate commerce," and "air carriers and foreign air

8   carriers subject to part A of subtitle VII of title 49."  And Congress crafted this exemption without

9   reference to the activities in which these entities engage.  *Id.*  The common-carrier exemption by

10  its terms thus exempts entities, not just certain activities engaged in by those entities, from the

11  coverage of the FTC Act.

12      The legislative history of the amendments to Section 5 underscores this point.  After

13  Congress passed the Communications Act in 1934, it amended the FTC Act in 1938, expressly to

14  exempt common carriers subject to the Communications Act.  *See* Wheeler-Lea Act, Pub. L. No.

15  75-447, § 3, 52 Stat. 111, 111 (1938).  In deliberations preceding the amendment, Congress

16  contemplated – *but did not adopt* – statutory language providing "that common carriers under the

17  [Communications] [A]ct are excepted as common carriers under [the FTC] [A]ct *only in respect of*

18  *their common-carrier operations*."  *To Amend the Federal Trade Commission Act:  Hearing on*

19  *H.R. 3143 Before the H. Comm. on Interstate and Foreign Commerce*, 75th Cong. 23, 25 (1937)

20  [hereinafter *Hearing Tr.*] (emphasis added).  The purpose of that proposal was to qualify that,

21  "where common carriers engage in activities that are not in the common carrier field, beyond the

22  field that the Government is regulating, then and in that case, they are subject to the jurisdiction of

23  the Federal Trade Commission."  *Id.* at 26.  But that text was not incorporated into the final

24  version of the law.  Instead, Congress adopted the language we have today, which flatly exempts

25  common carriers from the FTC's jurisdiction on an entity-by-entity basis.

26      This interpretation is further confirmed by contrasting the common-carrier exemption with

27  the language and history of Section 5's exemption related to the Packers and Stockyards Act.

28

1    When Congress amended the FTC Act in 1938, Section 5 also exempted "persons, partnerships, or

2    corporations subject to the Packers and Stockyards Act."  Wheeler-Lea Act § 3.  But, in 1958,

3    Congress amended that clause to exempt companies only "*insofar as they are subject to* the

4    Packers and Stockyards Act," thus preserving FTC enforcement authority with respect to activities

5    that are *not* subject to the Packers and Stockyards Act – even if the company engaging in those

6    activities *is*, at other times, subject to that Act.  Pub. L. No. 85-909, § 3, 72 Stat. 1749, 1750

7    (1958) (codified as amended at 15 U.S.C. § 45(a)(2)) (emphasis added).  Contrasting the amended

8    activity-specific language of the Packers and Stockyards Act exemption with the status-linked

9    language of the common-carrier exemption (and the original Packers and Stockyards exemption)

10   shows that Congress made a deliberate choice to treat the two exemptions differently.  "[W]hen

11   the legislature uses certain language in one part of the statute and different language in another,

12   [courts] assume[] different meanings were intended."  *Sosa v. Alvarez-Machain*, 542 U.S. 692,

13   711 n.9 (2004) (internal quotation marks omitted).

14        The presumption of different meanings has particular force here.  By literally replacing a

15   status-based exemption for entities subject to the Packers and Stockyards Act with an activity-

16   based exemption twenty years later, Congress made inescapably clear that it distinguishes between

17   the two.  *Cf. United States v. Stevenson*, 215 U.S. 190, 198 (1909) ("It is not to be presumed that

18   this change is meaningless, and that Congress had no purpose in making it.").  Congress

19   understood that the first incarnation of the Packers and Stockyards Act exemption – and thus the

20   enduring language of the common-carrier exemption – created an entity-by-entity exemption.  *See*

21   H.R. Rep. No. 85-1048, at 6 (1957).  Congress easily could have drafted (or amended) the

22   common-carrier exemption to apply only to common carriers "insofar as they are engaged in

23   common carriage subject to the Acts to regulate commerce."  Indeed, as noted, Congress had before

24   it a proposal to exempt common carriers "only in respect of their common carrier operations."

25   *Hearing Tr.* 23, 25.  But Congress did not adopt that language, indicating "that the legislature

26   [did] not intend the bill to include the provisions embodied in the rejected amendment."  2A

27   Norman J. Singer, *Statutes and Statutory Construction* § 48:18 (7th ed. 2013); *see Russello v.*

28

*United States*, 464 U.S. 16, 23-24 (1983) ("Where Congress includes limiting language in an earlier version of a bill but deletes it prior to enactment, it may be presumed that the limitation was not intended.").

By adopting a status-based exemption, Congress "demonstrated its adherence to its traditional policy of dividing regulatory responsibilities along industry lines, rather than, as the FTC suggests, on the basis of particular activities." *Miller*, 549 F.2d at 459. The enactment of the Communications Act in 1934 – 20 years after the 1914 FTC Act – reflected Congress's determination that "a more effective execution" of national communications policy would best be served "by centralizing authority heretofore granted by law to several agencies." 47 U.S.C. § 151. "The [FCC] was expected to serve as the single Government agency with uniform jurisdiction and regulatory power over all forms of electrical communication, whether by telephone, telegraph, cable, or radio." *United States v. Southwestern Cable Co.*, 392 U.S. 157, 167-68 (1968) (internal quotation marks and footnotes omitted). The purpose of the "common-carrier exemption" is thus to "prevent[ ] interagency conflict" that would arise if the FTC regulated industries that are already subject to the authority of specialized agencies such as the FCC. *FTC v. Verity Int'l, Ltd.*, 443 F.3d 48, 57 (2d Cir. 2006) ("*Verity II*"); *see also Miller*, 549 F.2d at 457.

## II.   The Case Law Is Consistent on the Meaning of the Exemption

In the 100 years of the FTC's existence, no court has authorized the FTC to assert jurisdiction over a common carrier. Thus, in *FTC v. Miller*, the Seventh Circuit rejected the FTC's argument that, for purposes of the jurisdictional exemption, the relevant inquiry is whether "the particular activity in question" is subject to regulation by the other agency. 549 F.2d at 457. Instead, the court recognized that, in the case of a company engaged in the business of transporting mobile homes and subject to regulation as a common carrier under the Interstate Commerce Act, "the words of the [FTC] Act plainly exempt from the [FTC's] investigatory jurisdiction any corporation *holding the status of a common carrier* regulated by the [Interstate Commerce Commission ('ICC')]." *Id.* at 456-57 (emphasis added). The court accordingly rejected the FTC's

1   attempt to assert jurisdiction over advertising activities that it argued fell outside the scope of ICC

2   regulation.[14]

3         The FTC itself has not hesitated to advance this status-based argument when doing so

4   leads to an *expansion* of its jurisdiction.  For example, the FTC successfully argued that a non-

5   common carrier engaged in common carrier-like activities is not entitled to the benefit of the

6   jurisdictional exemption; what matters is the *status* of the company in question, not the activities it

7   performs.  *See Official Airline Guides, Inc. v. FTC*, 630 F.2d 920, 923 (2d Cir. 1980) ("[I]t is of no

8   significance that the publishing of airline schedules is an activity affecting competition among air

9   carriers subject to the Federal Aviation Act.  Since Donnelley is not itself an air carrier, it is not

10  beyond the [FTC's] jurisdiction."); *FTC v. American Standard Credit Sys., Inc.*, 874 F. Supp.

11  1080, 1086 (C.D. Cal. 1994) (finding that alleged agent of bank, despite engaging in banking

12  activities, did not fit Section 5's exemption because it lacked the status of "banks, savings and

13  loan institutions"); *National Fed'n of Blind v. FTC*, 303 F. Supp. 2d 707, 714-15 (D. Md. 2004)

14  (telefunders can be regulated by the FTC, "regardless of the fact that they engage in the same

15  activities as the nonprofits [which are outside of the FTC's jurisdiction]," because "[c]ourts have

16  held that an entity's exemption from FTC jurisdiction is based on that entity's *status*, not its

17  activity"), *aff'd*, 420 F.3d 331 (4th Cir. 2005); *FTC v. CompuCredit Corp.*, No. 1:08-CV-1976-

18  BBM-RGV, 2008 WL 8762850, at *1, *3-4 (N.D. Ga. Oct. 8, 2008) (finding that non-bank which

19  "perform[ed] contractual services for banks" such as "market[ing] subprime credit cards to

20  consumers" was not subject to Section 5's exemption of "banks, savings and loan institutions,"

21  and endorsing the FTC's argument that "the exemptions in § 45(a)(2) are focused on the status of

22  the entity claiming exemption and not the activities of the entity"); *cf. FTC v. Saja*, No. Civ-97-

23  0666-PHX-SMM, 1997 WL 703399, at *2 (D. Ariz. Oct. 7, 1997) (finding that "Defendants'

24                    _____

[14] In *Miller*, the FTC did not contend that the advertising activities of the company in

25  question were non-common-carrier activities.  Rather, the FTC argued that these activities were
    simply not ones that the ICC would regulate and so the purpose of the exemption – to avoid

26  interagency conflict – was not implicated.  But, in rejecting this argument, the court emphasized
    that it was the *status* of the company as a common carrier subject to the ICC's regulation – not the

27  particular nature of the activities in question – that mattered for purposes of applying the exemption.
    No court of appeals has ever held otherwise.

28

status, in part, as fundraisers for not-for-profit organization[s] does not create not-for-profit status" for purposes of the exemption).  The FTC has even *held*, in an administrative proceeding, that "Section 5(a)(2) specifically lists *categories of businesses* whose acts and practices are not subject to the Commission's authority under the FTC Act."  Order, *LabMD, Inc.*, No. 9357, 2014 WL 253518, at *10 (F.T.C. Jan. 16, 2014) (emphasis added).

The only case even arguably supporting a contrary reading of Section 5 is the district court's decision in *FTC v. Verity International, Ltd.*, 194 F. Supp. 2d 270 (S.D.N.Y. 2002) ("*Verity I*").  The court there stated that the common-carrier exemption "depends on the particular activity at issue," rather than on the "status" of the entity.  *Id.* at 275-76.  No other court has endorsed such a misreading of Section 5, and the Second Circuit declined to affirm on the same basis as the district court, finding instead that the defendant was not a common carrier at all.  *See Verity II*, 443 F.3d at 58-60.  Indeed, the Solicitor General, on behalf of the FTC, opposed certiorari by noting that "[t]he court of appeals expressly assumed that the relevant question was whether [defendant] had the status of a common carrier" and asserting that the Second Circuit was "clearly correct" in finding that the defendant "lacked that status."  Br. for the FTC in Opp. at 7, *Verity Int'l, Ltd. v. FTC*, No. 06-669 (U.S. filed Feb. 15, 2007), *available at* http://www.justice.gov/osg/briefs/2006/0responses/2006-0669.resp.pdf.

## III.      Mobile Broadband Data Service Is Already Subject to FCC Regulation

Even though mobile broadband data services are not currently treated as common carriage, they are still subject to FCC authority under Title III of the Communications Act and Section 706 of the Telecommunications Act.  Indeed, as already indicated, the FCC has opened an investigation into whether AT&T's MBR program complies with its rules governing mobile data services, and has since indicated that it may file and adjudicate its own complaint against AT&T. The FTC's attempt to assert jurisdiction here would thus create precisely the overlapping jurisdiction that Congress sought to avoid.

The FCC issued its *Open Internet Order* in December 2010, almost a full year before AT&T imposed its MBR program.  AT&T relied on that *Order* in determining both the

1    reasonableness of its network practices and the adequacy of its consumer disclosures.  If these

2    same network management practices and consumer disclosures are now to be subject to an FTC

3    enforcement action, then wireless carriers would be exposed to just the kind of overlapping and

4    potentially conflicting regulation that Congress sought to prevent with the Section 5 exemption.[15]

5    Indeed, the potential for such overlapping and conflicting regulation has become especially acute

6    in light of the imminent FCC proceeding to determine the compatibility of AT&T's MBR program

7    with the Commission's Open Internet rules.  The FTC is attempting to brand as "unfair" a program

8    that AT&T believes was a permissible network management tool under the FCC's *Open Internet*

9    *Order*.  And the FTC is attempting to brand as "inadequate" disclosures that AT&T believes fully

10   complied with the FCC's transparency requirements.  The FCC has indicated that it will adjudicate

11   these issues.  As a prior Chairman of the FCC noted in commenting on this suit, "What the Federal

12   Trade Commission has done, they're basically stepping onto the turf of the Federal

13   Communications Commission."[16]

14   **IV.      The FTC Cannot Rewrite the Statute To Expand Its Own Jurisdiction**

15          Finally, the FTC is well aware that Section 5, as drafted, withholds authority to regulate

16   AT&T and other common carriers, and that is why it has repeatedly (though unsuccessfully)

17   lobbied Congress to repeal the common-carrier exemption.  In 2002, an FTC commissioner stated

18   that the Section 5 exemption hinders its ability to regulate "business activities of

19   telecommunications firms [that] have now expanded far beyond common carriage," such as

20

21          [15] The FCC has ample authority to ensure compliance with its regulations, including
     forfeiture penalties, *see* 47 U.S.C. § 503(b), and it has not been reluctant to exercise such authority.
22   *See generally Action for Children's Television v. FCC*, 59 F.3d 1249, 1253 (D.C. Cir. 1995)
     (describing the FCC's "enforcement scheme," including 47 U.S.C. § 503, which "govern[s] all
23   types of forfeitures"); *Comtronics, Inc. v. Puerto Rico Tel. Co.*, 553 F.2d 701, 704 (1st Cir. 1977)
     (describing the FCC's "enforcement power" with respect to seeking "penalties for violations of
24   FCC orders"); *Progressive Cellular III B-3 v. FCC*, 986 F.2d 546 (D.C. Cir. 1993) (Table) (noting
     the "FCC's rigorous enforcement of its hard-nosed rules, even where enforcement produces a harsh
25   result") (internal quotation marks and citation omitted).

26          [16] Katy Bachman & Brooks Boliek, *FTC, FCC Jostling Over Telecom Turf*, Politico Pro
     (Oct. 30, 2014), *available with registration at* http://www.politicopro.com/story/tech/?id=40104;
27   *see also* Jeff Roberts, *Why a DC turf war may have played a part in the timing of the FTC's mobile
     data lawsuit against AT&T*, Gigaom (Oct. 28, 2014), https://gigaom.com/2014/10/28/why-a-dc-turf-
     war-may-have-played-a-part-in-the-timing-of-the-ftcs-mobile-data-lawsuit-against-att.

28

---

"Internet services," and urged Congress to repeal the exemption so the agency would not be "forced to" "litigat[e] this issue" in court.[17]  In 2003, the FTC informed a House subcommittee that the exemption "hamper[s] the FTC's oversight of the non-common-carrier activities" of common carriers.[18]  And in November 2011, FTC Commissioner J. Thomas Rosch acknowledged the strong arguments that "constrain[ ]" the agency's jurisdiction over mobile data.[19]  The FCC's decision not to classify data services as common carriage, Commissioner Rosch explained, "does not necessarily mean that the service is therefore subject to regulation by . . . the FTC."  "[W]e get our jurisdiction directly from Congress . . . not from another agency."[20]

As the FTC's own unsuccessful pleas to Congress make plain, its proposed reading of Section 5 is foreclosed by the language of the statute.  The FTC may not now seek to exercise the very jurisdiction that Congress has consistently declined to grant it.  *See, e.g.*, *City of Arlington v. FCC*, 133 S. Ct. 1863, 1874 (2013) ("Where Congress has established a clear line, the agency

---

[17] *FTC Reauthorization:  Hearing Before the Subcomm. on Consumer Affairs, Foreign Commerce and Tourism of the S. Comm. on Commerce, Science, and Transportation*, 107th Cong. 27-28 (2002) (statement of FTC Commissioner Sheila F. Anthony), *available at* http://www.gpo.gov/fdsys/pkg/CHRG-107shrg91729/pdf/CHRG-107shrg91729.pdf.

[18] Prepared Statement of the Federal Trade Commission, Before the Subcomm. on Commerce, Trade and Consumer Protection of the H. Comm. on Energy and Commerce, 2003 WL 21353573, at *19 (June 11, 2003).

[19] "Neutral on Internet Neutrality:  Should There Be a Role for the Federal Trade Commission?," Remarks of J. Thomas Rosch, Commissioner, FTC, Before the Global Forum 2011: Vision for the Digital Future 11-15 (Nov. 7, 2011), *available at* http://www.ftc.gov/ sites/default/files/documents/public_statements/neutral-internet-neutrality-should-there-be-role-federal-trade-commission/111107globalforum.pdf.

[20] *Id.* at 12.  For this reason, the FTC's assertion of jurisdiction fares no better even if the FCC purports to support the FTC's action.  It is well established that one agency may not cede jurisdiction to another.  *See Textile & Apparel Grp., Am. Importers Ass'n v. FTC*, 410 F.2d 1052, 1057-58 (D.C. Cir. 1969) (footnote omitted) ("[T]he Commission's argument runs afoul of the general principle that authority committed to one agency should not be exercised by another.  The reason for this is that Congress delegates to one agency certain authority, perhaps because it feels that agency is the most capable of exercising it. . . . Further, the political realities are often such that Congress has chosen a particular agency with a particular orientation toward a problem; the proper place for interested parties to get a different agency . . . to handle the job is back in Congress."); *Shook v. D.C. Fin. Responsibility & Mgmt. Assistance Auth.*, 132 F.3d 775, 783 (D.C. Cir. 1998) ("[I]t would be unusual, if not unprecedented, for Congress to authorize the Board of Education to delegate its own governing authority, its policymaking function, to another outside multi-member body.  That sort of delegation is inconsistent with the grant of overall authority to the Board of Education . . . .").

---

1  cannot go beyond it; and where Congress has established an ambiguous line, the agency can go no

2  further than the ambiguity will fairly allow."); *Lousiana Pub. Serv. Comm'n v. FCC*, 476 U.S.

3  355, 374-75 (1986) ("An agency may not confer power upon itself.  To permit an agency to

4  expand its power in the face of a congressional limitation on its jurisdiction would be to grant to

5  the agency power to override Congress.  This we are both unwilling and unable to do."); *American*

6  *Bankers Ass'n v. SEC*, 804 F.2d 739, 754-55 (D.C. Cir. 1986) ("The whole point of the bank

7  exclusion clauses in the definitions of 'broker' and 'dealer' is to place banks outside the broker-

8  dealer jurisdiction of the SEC and leave them to the jurisdiction of banking regulators alone.  The

9  SEC cannot use its definitional authority to expand its own jurisdiction and to invade the

10  jurisdiction of other agencies, including the Board of Governors.").

**CONCLUSION**

12       For the reasons set forth above, AT&T respectfully requests that the Court dismiss this

13  action pursuant to Federal Rule of Civil Procedure 12(b)(1).

14  Dated: January 5, 2015                                    Respectfully submitted,

15                                                                        KELLOGG, HUBER, HANSEN, TODD,
                                                                              EVANS & FIGEL, P.L.L.C.
16
                                                                          By:      /s/ *Michael K. Kellogg*
17                                                                                Michael K. Kellogg

18                                                                        Attorney for Defendant
                                                                              AT&T Mobility, LLC
19

20

21

22

23

24

25

26

27

28