DAVID C. SHONKA
Acting General Counsel

EVAN ROSE, Cal. Bar No. 253478
MATTHEW D. GOLD, N.Y. Bar No. 2073963
LAURA FREMONT, Cal. Bar No. 159670
ERIC EDMONDSON, D.C. Bar No. 450294
KERRY O'BRIEN, Cal. Bar No. 149264
DAVID M. NEWMAN, Cal. Bar No. 54218
LINDA K. BADGER, Cal. Bar No. 122209

Address:     Federal Trade Commission
             901 Market Street, Suite 570
             San Francisco, CA 94103

Email:       erose@ftc.gov; mgold@ftc.gov; lfremont@ftc.gov;
             eedmondson@ftc.gov; kobrien@ftc.gov;
             dnewman@ftc.gov; lbadger@ftc.gov

Tel. / Fax:  (415) 848-5100 / (415) 848-5184

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
San Francisco Division

| | |
|---|---|
| FEDERAL TRADE COMMISSION, <br><br>    Plaintiff, <br><br>        v. <br><br> AT&T MOBILITY LLC, a limited liability company, <br><br>    Defendant. | **Case No. 14-cv-04785-EMC** <br><br> **PLAINTIFF FTC'S OPPOSITION TO DEFENDANT AT&T'S MOTION TO DISMISS** <br><br> Hearing Date:  Mar. 12, 2015 <br> Time:         9:30 a.m. <br> Courtroom:   5, 17th Floor |

**TABLE OF CONTENTS**

I.      INTRODUCTION ...................................................................................................1

II.     STATEMENT OF ISSUES PURSUANT TO LOCAL RULE 7-4...................................2

III.    FACTUAL BACKGROUND .........................................................................................2

IV.     ARGUMENT ............................................................................................................5

        A.      The language and structure of the FTC Act, as well as its legislative history
                and purpose, establish that the common carrier exemption is activity based,
                not status based ..........................................................................................5

                1.      The relevant rules of statutory construction weigh against AT&T.............6

                2.      The language and structure of Section 5 strongly support an
                        activity-based reading of the common carrier exemption...........................6

                3.      The legislative history of the FTC Act confirms that Congress intended
                        the common carrier exemption to be activity based ................................10

                4.      Courts have adopted the activity-based approach....................................12

                5.      A status-based interpretation of the common carrier exemption would
                        undermine the purpose of the FTC Act and lead to illogical results .........15

        B.      AT&T itself has previously recognized that its provision of mobile data is
                subject to the FTC Act ..............................................................................17

                1.      AT&T's current arguments to the Court contradict its past arguments
                        to the FCC .............................................................................................17

                2.      The FTC has consistently asserted jurisdiction over mobile data and
                        other non-common carrier services, regardless of a service provider's
                        "status"...................................................................................................19

        C.      FCC jurisdiction over mobile data does not preclude FTC jurisdiction ...............21

                1.      Overlapping jurisdiction is both common and permissible .......................21

                2.      The FCC and the FTC have a history of orderly cooperation and
                        coordination ...........................................................................................22

3.   There is no conflict between the FCC's rules and this FTC
        enforcement action ..................................................................................23

4.   Congress did not intend to divide responsibility along industry lines .......24

V.   CONCLUSION ...................................................................................................25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Opp. to Motion to Dismiss – 14-cv-04785-EMC**                                 **Page iii**

1

**TABLE OF AUTHORITIES**

2

**Cases**

3

*Bank of Ky. v. Adams Express Co.*, 93 U.S. 174 (1876)...................................................8

4

*BedRoc Ltd. v. United States*, 541 U.S. 176 (1984).......................................................8

5

*Chi., Milwaukee, & St. Paul Ry. v. Wallace*, 66 F. 506 (7th Cir. 1895) .........................................9

6

*City of Edmonds v. Wash. State Bldg. Code Council*, 18 F.3d 802 (9th Cir. 1994) ......................6

7

*Computer & Commc'ns Indus. Ass'n v. FCC*, 693 F.2d 198 (D.C. Cir. 1982) ...........................10

8

*Crosse & Blackwell Co. v. FTC*, 262 F.2d 600 (4th Cir. 1959)................................................12, 13

9

*FCC v. Midwest Video Corp.*, 440 U.S. 689 (1979) .......................................................7

10

*FTC v. Accusearch, Inc.*, 570 F.3d 1187 (10th Cir. 2009).......................................................21

11

*FTC v. Cyberspace.com, LLC*, 453 F.3d 1196 (9th Cir. 2006)........................................................16

12

*FTC v. Fred Meyer, Inc.*, 390 U.S. 341 (1968)...................................................15

13

*FTC v. Miller*, 549 F.2d 452 (7th Cir. 1977) ...................................................13, 14, 24

14

*FTC v. Morton Salt Co.*, 334 U.S. 37 (1948)...................................................6

15

*FTC v. Pantron I Corp.*, 33 F.3d 1088 (9th Cir. 1994)...................................................15

16

*FTC v. Texaco, Inc.*, 555 F.2d 862 (D.C. Cir. 1977) (en banc) ...................................................21

17

*FTC v. T-Mobile USA, Inc.*, No. 2:14-cv-00967-JLR (W.D. Wa. July 1, 2014)

18

(complaint)...................................................20

19

*FTC v. TracFone Wireless, Inc.*, Case No. 3:15-cv-00392 (N.D. Cal. Jan. 28, 2015)

20

(complaint)...................................................20

21

*FTC v. Verity Int'l, Ltd.*, 194 F. Supp. 2d 270 (S.D.N.Y. 2002), *aff'd*, 443 F.3d 48

22

(2d Cir. 2006)...................................................12, 16

23

*FTC v. Verity Int'l, Ltd.*, 443 F.3d 48 (2d Cir. 2006) ...................................................9, 12

24

*Hall v. United States*, 182 L. Ed. 2d 840 (U.S. 2012)...................................................8

25

*ICC v. Balt. & Ohio R.R.*, 145 U.S. 263 (1892)...................................................8

26

*ICC v. Goodrich Transit Co.*, 224 U.S. 194 (1912)...................................................9

27

*In re Alpine Indus., Inc.*, 120 F.T.C. 649 (1995) ...................................................16

28

*In re America Online, Inc. & Compuserve Interactive Servs., Inc.*, 137 F.T.C. 117 (2004) ............................................................................................16

*In re AOL, Inc.*, 125 F.T.C. 403 (1998) ............................................................16

*In re CompuServe, Inc.*, 125 F.T.C. 451 (1998) ...............................................16

*In re Giant Food, Inc.*, 54 F.T.C. 1881 (1957), *aff'd*, 307 F.2d 184 (D.C. Cir. 1962) .................13

*In re Jenny Craig, Inc.*, 125 F.T.C. 333 (1998) ...............................................16

*In re Juno Online Servs., Inc.*, 131 F.T.C. 1249 (2001) ..................................16

*In re Prodigy, Inc.*, 125 F.T.C. 430 (1998)......................................................16

*In re WebTV Networks, Inc.*, 2000 FTC LEXIS 171 (Dec. 8, 2000) ...............16

*Joffe v. Google, Inc.*, 746 F.3d 920 (9th Cir. 2013) .........................................15

*Kan. City S. Ry. v. United States*, 282 U.S. 760 (1931) ...................................10

*Los Coyotes Band of Cahuilla & Cupeno Indians v. Jewell*, 729 F.3d 1025 (9th Cir. 2013) ................................................................................15

*Mississippi v. AU Optronics Corp.*, 134 S. Ct. 736 (2014)................................8

*Morton v. Moncari*, 417 U.S. 535 (1974) ........................................................21

*Nat'l Ass'n of Regulatory Util. Comm'rs v. FCC*, 533 F.2d 601 (D.C. Cir. 1976) ......................7

*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967 (2005) ......................7

*NLRB v. Ky. River Cmty. Care, Inc.*, 532 U.S. 706 (2001)...............................6

*N.Y., New Haven & Hartford R.R. v. ICC*, 200 U.S. 361 (1906).......................9

*Official Airline Guides v. FTC*, 630 F.2d 920 (2d Cir. 1980)..........................15

*Padilla v. Lever*, 463 F.3d 1046 (9th Cir. 2006)...............................................6

*Perrin v. United States*, 444 U.S. 37 (1979) .....................................................8

*R.R. v. Lockwood*, 84 U.S. 357 (1873)..............................................................8

*Santa Fe, Prescott & Phx. Ry. v. Grant Bros. Construction Co.*, 228 U.S. 177 (1913) ..............8–9

*Sw. Bell Tel. Co. v. FCC*, 19 F.3d 1475 (D.C. Cir. 1994).................................7

*Terminal Taxicab Co. v. Kutz*, 241 U.S. 252 (1916) ........................................9

*Thompson Med. Co. v. FTC*, 791 F.2d 189 (D.C. Cir. 1986) ..........................21

*United States v. Alisal Water Corp.*, 431 F.3d 643 (9th Cir. 2005)...................2

**Opp. to Motion to Dismiss – 14-cv-04785-EMC**                    **Page v**

*United States v. Sw. Cable Co.*, 392 U.S. 157 (1968)................................................24

*Verizon v. FCC*, 740 F.3d 623 (D.C. Cir. 2014) ................................................11, 23, 24

*Wabash Ry. v. McDaniels*, 107 U.S. 454 (1883) ................................................8

*Western Union Telegraph Co. v. Call Pub. Co.*, 181 U.S. 92 (1901)............................................8


**Statutes, Regulations & Rules**

15 U.S.C. § 44 ................................................5, 6

15 U.S.C. § 45(a)(2)................................................5, 6, 8, 14, 15

15 U.S.C. § 53(b)................................................2

28 U.S.C. § 1331................................................2

28 U.S.C. § 1345................................................2

47 C.F.R. § 8.3................................................23, 24

47 C.F.R. § 8.5................................................24

47 C.F.R. § 8.7................................................24

47 C.F.R. § 8.11(d)................................................24

47 U.S.C. § 153(51)................................................7

47 U.S.C. § 201(b)................................................17

47 U.S.C. § 332(c)(2)................................................6, 14

*Appropriate Framework for Broadband Access to the Internet Over Wireline Facilities*,
Report and Order, 20 FCC Rcd 14853 (2005), *aff'd sub nom. Time Warner
Telecom, Inc. v. FCC*, 507 F.3d 205 (3d Cir. 2007) ................................................17

Fed. R. Civ. P. 12(b)(1)................................................2

Fed. R. Civ. P. 12(b)(6)................................................2

Federal Trade Commission Act of 1914, 38 Stat. 717................................................8, 10

*Preserving the Open Internet*, Report and Order, 25 FCC Rcd 17905 (2010), *rev'd in
part and aff'd in part sub nom. Verizon v. FCC*, 740 F.3d 623 (D.C. Cir. 2014) .......23, 24

Wheeler-Lea Act, Pub. L. 75-447, 52 Stat. 111 (1938)................................................9, 10

**Legislative & Administrative Materials**

51 Cong. Rec. 8996 (May 21, 1914)...........................................................................10

*Annual Report to Congress for FY 2003 and 2004 Pursuant to the Do Not Call*
    *Implementation Act on Implementation of the National Do Not Call Registry*,
    *available at* http://www.ftc.gov/reports/donotcall/051004dncfy0304.pdf .......................22

AT&T Comments, *In the Matter of Framework for Broadband Internet Service*, GN
    Docket No. 10-127 (filed July 15, 2010), *available at* http://apps.fcc.gov/ecfs/
    document/view?id=7020544677.............................................................................18, 19

AT&T Reply Comments GN Docket No. 10-127 (filed Aug. 12, 2010), *available at*
    http://apps.fcc.gov/ecfs/document/view?id=7020706257 .................................18

*FTC Jurisdiction Over Broadband Internet Access Services*, Prepared Statement of the
    Federal Trade Commission to U.S. Senate Committee on the Judiciary, presented
    by Commissioner William E. Kovacic, June 14, 2006, *available at* http://www.ftc.
    gov/public-statements/2006/06/prepared-statement-ftc-jurisdiction-over-broadband-
    internet-access...........................................................................................................19

*FTC Reauthorization: Hearing Before the Subcommittee on Consumer Affairs, Foreign*
    *Commerce and Tourism of the Senate Committee on Commerce, Science, and*
    *Transportation*, 107th Cong., *available at* http://www.gpo.gov/fdsys/pkg/CHRG-
    107shrg91729/pdf/CHRG-107shrg91729.pdf ...........................................20, 21

*FTC Staff Report on Internet of Things*, Jan. 2015, *available at* http://www.ftc.gov/news-
    events/press-releases/2015/01/ftc-report-internet-things-urges-companies-adopt-
    best-practices...........................................................................................................16

*FTC Staff Report on Broadband Connectivity Competition Policy*, June 2007, *available*
    *at* http://www.ftc.gov/reports/broadband-connectivity-competition-policy-staff-
    report.....................................................................................................................19, 20

H.R. Rep. 75-1774 (1938)........................................................................................11

*Memorandum of Understanding Between the Consumer Financial Protection Bureau and the Federal Trade Commission*, Jan. 23, 2012, *available at* http://www.ftc.gov/system/files/120123ftc-cfpb-mou.pdf ..............................................................22

*Prepared Statement of the Federal Trade Commission Before the Committee on Energy and Commerce, United States House of Representatives*, Combating Pretexting: H.R. 936, Prevention of Fraudulent Access to Phone Records Act, Mar. 9, 2007, *available at* http://www.ftc.gov/os/testimony/P065409CommissionTestimonRe CombatingPretextingandHR936House.pdf ...................................................22

*To Amend the Federal Trade Commission Act*, Hearing on H.R. 3143 Before the H. Comm. on Interstate & Foreign Commerce, 75th Cong., 1st Sess (Feb. 18–19, 1937) ....................................................................................................................11

*Working Agreement Between FTC and Food and Drug Admin.*, 4 Trade Reg. Rep. (CCH) ¶ 9,850.01 (1971) ...........................................................................................22

**Periodicals, Press Releases & Other Materials**

*4G LTE from AT&T Available in Baltimore on November 6*, AT&T press release, Oct. 31, 2011, *available at* http://www.att.com/gen/press-room?pid=22034&cdvn=news&newsarticleid=33267 ..............................................................................5

Brian Fung, *Google could become a wireless carrier*, WASH. POST, Jan. 22, 2015, *available at* http://www.washingtonpost.com/blogs/the-switch/wp/2015/01/22/google-could-become-a-wireless-carrier-heres-what-that-means-for-you/ ..............................................16

Fitbit Flex Wristband Black Wireless Activity and Sleep Tracker, *available at* http://www.att.com/wearables/health-and-fitness/fitbit-flex-wristband-wireless-activity-and-sleep-tracker.html ..............................................................................................16

*How can I use my AT&T gift card?*, *available at* http://www.att.com/esupport/article.jsp?sid=52767 ...................................................................................................................16

Mike Flacy, *AT&T CEO regrets offering unlimited data plans, worries about SMS competitors*, DIGITAL TRENDS, May 5, 2012, *available at* http://www.digitaltrends.com/mobile/att-ceo-regrets-offering-unlimited-data-plans-worries-about-sms-competitors/.................................................................................................................3

Netatmo Urban Weather Station and Air Quality Sensor, *available at* http://www.att.com/accessories/specialty-items/netatmo-urban-weather-station-and-air-quality-sensor.html#sku=sku6610450...........................................................................16

Roger Cheng, *AT&T's CES splash: It's not about smartphones anymore*, CNET NEWS, Jan. 5, 2015, *available at* http://www.cnet.com/news/at-ts-ces-splash-its-not-just-about-smartphones-anymore/...........................................................................16

*T-Mobile to Pay At Least $90 Million, Including Full Consumer Refunds To Settle FTC Mobile Cramming Case*, FTC press release, Dec. 19, 2014, *available at* http://www.ftc.gov/news-events/press-releases/2014/12/t-mobile-pay-least-90-million-including-full-consumer-refunds .......................................................................22

## I.      INTRODUCTION

The Federal Trade Commission ("FTC") alleges in its Complaint (Dkt. #1) that Defendant AT&T Mobility LLC ("AT&T") has engaged in unfair and deceptive conduct in the marketing of mobile broadband internet access services ("mobile data").  Since late 2011, AT&T has failed to live up to its promise to provide unlimited mobile data to millions of its smartphone customers.  Instead—to avoid the cost of actually providing the unlimited data it promises—the company has throttled the data speed of unlimited customers who use more than a few gigabytes of data in a billing cycle.

With its Motion to Dismiss ("Motion") (Dkt. #29), AT&T now seeks to immunize itself entirely from FTC oversight for its misconduct.  AT&T claims that the common carrier exemption to the FTC Act shields it from any duty to comply with the FTC Act, even when it engages in non-common carrier activities, such as the sale of mobile data (or, for that matter, the sale of gift cards, consumer electronics, or home security services).

AT&T's "status-based" position runs counter to the text, structure, and intent of the FTC Act.  The Communications Act, which the FTC Act expressly incorporates to define the bounds of the common carrier exemption, unambiguously states that an entity may be treated as a common carrier only to the extent that it provides a common carrier service.  Mobile data is not a common carrier service, as AT&T acknowledges.  Moreover, the term "common carrier" has long been understood to apply only to particular activities, not to particular entities.  In addition, AT&T's proposed reading of Section 5 would undermine clear congressional intent that the common carrier exemption be activity based.

A narrow exemption in a broad, public-interest statute like the FTC Act should not be read as an expansive loophole.  A status-based interpretation would do exactly that by creating arbitrary and illogical gaps in the FTC's jurisdiction, and thereby substantially weakening federal consumer protection enforcement.  Any company that engaged in even a trivial amount of common carriage would be rendered immune from FTC oversight.  In fact, companies might find it beneficial to essentially purchase FTC Act immunity by initiating or acquiring a small measure of common carrier business.

**Opp. to Motion to Dismiss – 14-cv-04785-EMC**                                      **Page 1**

Finally, and perhaps most telling, AT&T's Motion contradicts the company's own position in filings it has previously made with the Federal Communications Commission ("FCC"). In 2010, AT&T urged the FCC not to classify fixed or mobile broadband internet access services as common carrier services because the effect of such reclassification would be to eliminate the FTC's authority over those services. This position is directly opposite to the one now advanced by AT&T.

For the foregoing reasons, we respectfully request that the Court deny AT&T's Motion.[1]

## II.    STATEMENT OF ISSUES PURSUANT TO LOCAL RULE 7-4

Whether, under the common carrier exemption to the FTC Act, a company is immune from FTC enforcement when it violates the FTC Act in the sale of its non-common carrier services merely because it also sells common carrier services.

## III.   FACTUAL BACKGROUND

AT&T is one of the largest providers of mobile voice and data telecommunications in the United States. (*See* Complaint ¶ 9, Exh. A-1) In 2007, when Apple introduced its "Revolutionary" and "Breakthrough" new iPhone (*see id.* at Exh. A-1), AT&T became the exclusive provider of mobile voice and data services for the device. (*See id.* ¶ 10, Exh. A-1) Consumers use mobile data to, among other things, send and receive email, use GPS navigation, watch streaming video, and browse the internet. (*Id.* ¶ 9)

For the first few years that it sold various versions of the iPhone, AT&T offered customers an "unlimited" mobile data plan. (*Id.* ¶ 10) AT&T typically requires customers to enter into a contract with a two-year service commitment in which customers who cancel service before the end of the commitment must pay a substantial early termination fee. (*Id.* ¶ 33) Millions of customers signed up for unlimited data plans with AT&T. (*Id.* ¶ 12)

---

[1]  AT&T framed its Motion as a challenge to subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1). (Motion at 1) The Court does indeed have subject matter jurisdiction, however, because the Complaint raises a question of federal statutory law and was filed by a federal agency. *See* 28 U.S.C. §§ 1331, 1345; 15 U.S.C. § 53(b). AT&T's Motion implicates only the scope of the FTC's statutory authority. It is thus properly considered under Fed. R. Civ. P. 12(b)(6). *See United States v. Alisal Water Corp.*, 431 F.3d 643, 650–51 (9th Cir. 2005).

**Opp. to Motion to Dismiss – 14-cv-04785-EMC**                                     **Page 2**

In June 2010, AT&T ceased offering unlimited data plans to new customers, and instead introduced "tiered" data plans, which provide a specified amount of data each month for a certain price (e.g., 3 GB for $30), plus additional overage charges if a customer exceeds the monthly allowance.  (*Id.* ¶ 11)  The company had, for some time, been faced with a conundrum: Unlimited data is popular with customers but expensive to provide.  While many customers use only a few hundred megabytes in a billing cycle, some use significantly more.  AT&T saw what was coming at least as early as 2008 (*see* Motion at 4 ("data consumption . . . exploded")), but waited until mid-2010 to take any action.  (Complaint ¶ 11)  Even then, it grandfathered existing unlimited customers into their unlimited data plan, including when they purchased a new smartphone and entered into a new long-term contract.  (*Id.* ¶ 12)  AT&T feared it would lose to competitors the millions of customers it had acquired as the exclusive telecommunications provider for the iPhone.  (*See id.* ¶¶ 10–13)

Nevertheless, while AT&T had taken steps to retain unlimited customers, the company still believed that it had made a bad deal with them—or at least with those who used more than a few hundred megabytes each month.[2]  AT&T thus found a way to selectively undo this deal, while minimizing its loss of subscribers.  Instead of continuing to abide by its commitment to provide unlimited data, AT&T, in October 2011, began imposing a substantial limitation on unlimited customers' data speed.  (*See id.* ¶ 16)  Once they use a few gigabytes of data in a given billing cycle, their data speed is reduced, or "throttled," until the start of their next billing cycle.  (*See id.* ¶¶ 16–17)  AT&T has throttled data speeds by 60–95%.  (*Id.* ¶ 20)  When customers are throttled, they discover that many everyday applications, such as web browsing, GPS navigation, and streaming video, are significantly slower, and in some cases are severely impaired or rendered practically inoperable.  (*Id.* ¶¶ 20, 22, 25)

---

[2]  Parent company CEO Randall Stephenson said, in 2012, "My only regret was how we introduced pricing . . . .  Thirty dollars and you get all you can eat. . . . Every additional megabyte you use in this network, I have to invest capital."  Mike Flacy, *AT&T CEO regrets offering unlimited data plans, worries about SMS competitors*, DIGITAL TRENDS, May 5, 2012. Please see the Table of Authorities ("TOA") for citation hyperlinks.

**Opp. to Motion to Dismiss – 14-cv-04785-EMC**                                    **Page 3**

Even though AT&T had placed a significant limit on throttled customers, the company sought to continue reaping the marketing benefits of the word "unlimited."  Toward this end, AT&T chose not to disclose the throttling limitation at the point of sale when customers renewed their contracts (*id.* ¶ 34), making it unlikely that these customers would learn that the promise of unlimited data was illusory.  AT&T actually rejected an alternative throttling program that involved informing all customers at renewal, in part because it did not enable AT&T to "isolat[e] communications to [the] heaviest users."  (*Id.* ¶ 28)

Consumers are surprised when they learn that AT&T is limiting their data speed; they believe that "[u]nlimited means without restriction."  (*See id.* ¶ 24)  AT&T's own internal focus group research reached this same conclusion:  "[C]onsumers felt 'unlimited should mean unlimited.'"  (*Id.* ¶ 21)  Moreover, by late 2011, many unlimited customers had been on the plan for years (*see id.* ¶¶ 10–12) and knew from experience that AT&T's interpretation of "unlimited data" tracked the plain meaning of the phrase: use as much data as you want without being capped, throttled, or charged additional fees.  With its throttling program, however, AT&T changed the meaning of unlimited.

 AT&T characterizes its throttling program as applying to consumers "whose data consumption placed them in the top 5 percent of data-usage customers in a given month" (Motion at 4), but AT&T does not throttle customers on tiered plans, no matter how much data they use in any given month.  (Complaint ¶ 29)  Essentially, then, AT&T has taken data from unlimited customers and resold it to tiered customers.

AT&T also characterizes the program as "a permissible network management tool" (Motion at 15), but the speed reductions do not depend on actual network congestion at a particular time or at a particular cell tower.  Throttled customers are subject to reduced speeds for the duration of their billing cycle, even when AT&T's network has ample capacity to carry the customers' data, or if the use occurs in an area where the network is not congested. (Complaint ¶ 26)  Further, AT&T has throttled customers on its 4G LTE network since the throttling program was introduced in late 2011 (*see id.* ¶¶ 15–16, 18), even though the

**Opp. to Motion to Dismiss – 14-cv-04785-EMC**                                      **Page 4**

company's 4G LTE network was brand new at the time.[3]  In contrast, as mentioned above, AT&T does not throttle its tiered customers, even if they use more than ten times the data that an unlimited customer can use before being throttled, and even if they do so during peak periods of usage.  (*See id.* ¶ 29)  The upshot is that AT&T's throttling program targets its least profitable customers, not real-time network congestion.

AT&T's throttling program has caused substantial injury to consumers.  The company has throttled more than 3.5 million unique customers more than 25 million times, for an average of twelve days each time.[4]  (*Id.* ¶ 27)  Throttled customers are typically under contract and are unable to cancel their service without paying a substantial early termination fee.  (*Id.* ¶¶ 33, 38–42)  AT&T's throttling program has generated thousands of complaints to AT&T, the Better Business Bureau, and government agencies.  (*Id.* ¶¶ 23–25)  AT&T has received more than 190,000 customer calls relating to its throttling program.  (*Id.* ¶ 23)

On October 28, 2014, the FTC filed the Complaint initiating this case.  Pursuant to stipulation, AT&T filed its Motion on January 5, 2015.

## IV.    ARGUMENT

### A.    The language and structure of the FTC Act, as well as its legislative history and purpose, establish that the common carrier exemption is activity based, not status based.

Section 5 of the FTC Act "empower[s] and direct[s]" the FTC to take action against "unfair or deceptive acts or practices in or affecting commerce."  15 U.S.C. § 45(a)(2).  Exempted from the FTC's jurisdiction, however, are "common carriers subject to the Acts to regulate commerce."  *Id.*  The FTC Act separately defines "Acts to regulate commerce" to include "the Communications Act of 1934 and all Acts amendatory thereof and supplementary thereto."  15 U.S.C. § 44.

---

[3]  *See, e.g.*, *4G LTE from AT&T Available in Baltimore on November 6*, AT&T press release, Oct. 31, 2011 ("AT&T plans to deliver 4G LTE over 700 MHz, as well as 1700/2100 MHz AWS spectrum, which enables strong coverage and excellent capacity.") (link in TOA).

[4]  These figures do not include instances in which customers reduced their usage to avoid being throttled again.

**Opp. to Motion to Dismiss – 14-cv-04785-EMC**                                        **Page 5**

AT&T urges the Court to adopt an expansive "status-based" reading of the common carrier exemption. According to AT&T, a company that provides *any* common carrier service has the "status" of a common carrier and is entirely exempt from FTC authority, even if the particular activity that violates the FTC Act is not a common carrier service. Thus, even though AT&T acknowledges that mobile data is not a common carrier service, it claims it is exempt from the FTC Act because another line of its business (mobile voice) is common carriage.

As set forth below, however, the common carrier exemption is a narrower "activity-based" exception, excluding only services that are subject to the Communications Act's common carrier regulatory provisions. This interpretation is supported by the language of the exemption and its statutory context. Moreover, the legislative history of Section 5 confirms that Congress intended the exemption to be activity based. Indeed, to find otherwise would substantially undermine the overarching purpose of the FTC Act.

### 1. The relevant rules of statutory construction weigh against AT&T.

AT&T faces a steep hurdle in seeking an expansive reading of the common carrier exemption. As a "general rule of statutory construction," a party that seeks to qualify for "a special exception to the prohibitions of a statute" must meet "the burden of proving [such an] . . . exemption." *FTC v. Morton Salt Co.*, 334 U.S. 37, 44–45 (1948); *NLRB v. Ky. River Cmty. Care, Inc.*, 532 U.S. 706, 711 (2001). Moreover, remedial statutes—such as the FTC Act—should be read broadly, *see Padilla v. Lever*, 463 F.3d 1046, 1057 (9th Cir. 2006), and exceptions from such a statute should be construed narrowly. *See City of Edmonds v. Wash. State Bldg. Code Council*, 18 F.3d 802, 804 (9th Cir. 1994).

### 2. The language and structure of Section 5 strongly support an activity-based reading of the common carrier exemption.

The common carrier exemption applies, in the communications context, only to common carriers that are "subject to" the Communications Act. 15 U.S.C. §§ 44, 45(a)(2). The Communications Act specifies that a provider of private mobile service (such as mobile data) "shall not, insofar as such person is so engaged, be treated as a common carrier for any purpose under this Act." 47 U.S.C. § 332(c)(2). So, under the Communications Act, when AT&T

**Opp. to Motion to Dismiss – 14-cv-04785-EMC**                                      **Page 6**

1    provides mobile data, it may not be deemed a common carrier subject to the Act.  Another

2    provision similarly establishes that a "telecommunications carrier shall be treated as a common

3    carrier under this Act only to the extent that it is engaged in providing telecommunications

4    services."[5]  47 U.S.C. § 153(51).  Thus, the Communications Act makes unambiguously clear

5    that a company is not a "common carrier subject to" the Act when it provides mobile data

6    service; to be a "common carrier subject to" the Act means to be subject to the common carriage

7    provisions of the Act.  Because the FTC Act incorporates the Communications Act by reference,

8    it is equally clear that the common carrier exemption applies only to the extent that AT&T

9    engages in common carrier services.  The plain language of the relevant statutes is, accordingly,

10   sufficient basis in and of itself to deny AT&T's Motion.

11          Indeed, courts determined long ago that an entity is a common carrier subject to the

12   Communications Act only to the degree it is engaged in common carrier activities and not

13   because of its general "status" as a common carrier.  As the D.C. Circuit put it, "[W]hether an

14   entity in a given case is to be considered a common carrier or a private carrier turns on the

15   particular practice under surveillance."  *Sw. Bell Tel. Co. v. FCC*, 19 F.3d 1475, 1481 (D.C. Cir.

16   1994).  "Since it is clearly possible for a given entity to carry on many types of activities," it is

17   "logical to conclude that one can be a common carrier with regard to some activities but not

18   others."  *Nat'l Ass'n of Regulatory Util. Comm'rs v. FCC*, 533 F.2d 601, 608 (D.C. Cir. 1976)

19   ("*NARUC II*").  And to "reach [a] conclusion" as to whether "a common carrier activity is

20   involved" in any particular instance, a court must "examin[e] the nature of the . . . activity and

21   the regulatory framework in which it is expected to operate."  *Id.* at 609; *see also FCC v.*

22   *Midwest Video Corp.*, 440 U.S. 689, 701 n.9 (1979) ("A cable system may operate as a common

23   carrier with respect to a portion of its service only.").

24          This activity-based approach is bolstered by the term "common carrier" itself.  The FTC

25   Act does not explicitly define "common carrier," but the words of a statue should be interpreted

26   using their "ordinary, contemporary, common" meaning at the time the statute was enacted.  *See*

27
28          [5]  "Telecommunications services" is synonymous with "common carrier" services.  *See*
     *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 992 (2005).

**Opp. to Motion to Dismiss – 14-cv-04785-EMC**                                          **Page 7**

1    *BedRoc Ltd. v. United States*, 541 U.S. 176, 184 (1984) (quoting *Perrin v. United States,* 444

2    U.S. 37, 42 (1979)).  In the same vein, the Court may "presume that 'Congress is aware of

3    existing law when it passes legislation.'"  *Mississippi v. AU Optronics Corp.*, 134 S. Ct. 736, 742

4    (2014) (quoting *Hall v. United States*, 182 L. Ed. 2d 840, 844 (U.S. 2012)).  The common carrier

5    exemption language in Section 5(a)(2 was enacted as part of the original FTC Act in 1914.  38

6    Stat. 717, 719.  At the time, the term "common carrier" was already widely understood to apply

7    only to particular activities.

8          Even "[p]rior to the enactment of the act of February 4, 1887, to regulate commerce,

9    commonly known as the Interstate Commerce Act, railway traffic in this country was regulated

10   by the principles of the common law applicable to common carriers."  *Western Union Telegraph*

11   *Co. v. Call Pub. Co.*, 181 U.S. 92, 102 (1901) (quoting *ICC v. Balt. & Ohio R.R.*, 145 U.S. 263,

12   275 (1892)) (citation omitted).  And whether companies were "to be regarded as common

13   carriers and . . . subject to all the legal responsibilities of such carriers" in any particular instance

14   depended on their specific "business and occupation."  *Bank of Ky. v. Adams Express Co.*, 93

15   U.S. 174, 177 (1876).  Carriers' duties under the common law of negligence did not turn on their

16   status, but rather depended on the activity in which they were engaged.  For example, they owed

17   the highest duty of care to their customers when providing freight or passenger transportation,

18   but owed less demanding "ordinary negligence" obligations to their employees in the context of

19   hiring workers and protecting them from employment hazards.  *See, e.g.*, *Wabash Ry. v.*

20   *McDaniels*, 107 U.S. 454, 461–62 (1883).

21         Thus, the common carrier obligations of businesses such as railroads, express delivery

22   companies, and telegraph companies depended on the "nature of [their] business," and courts

23   recognized that "[a] common carrier may, undoubtedly, become a private carrier, or a bailee for

24   hire, when, as a matter of accommodation or special engagement, [it] undertakes to carry

25   something which it is not [its ordinary] business to carry."  *R.R. v. Lockwood*, 84 U.S. 357, 377

26   (1873).  By the same token, when a railroad transported workers and supplies to construction

27   sites on its line, it was not engaged in a common carrier activity, and therefore was not subject to

28   the heightened tort-law duties of care imposed on common carriers.  *Santa Fe, Prescott &*

**Opp. to Motion to Dismiss – 14-cv-04785-EMC**                                                    **Page 8**

1    *Phx. Ry. v. Grant Bros. Construction Co.*, 228 U.S. 177, 185–88 (1913); *accord Chi.,*

2    *Milwaukee, & St. Paul Ry. v. Wallace*, 66 F. 506, 510 (7th Cir. 1895) (transportation of circus

3    animals was a private carriage service and therefore not subject to common carrier duties of

4    care).

5         Moreover, after Congress enacted the Interstate Commerce Act in 1887, but before it

6    enacted the FTC Act in 1914, contemporaneous judicial decisions had established that common

7    carriers were "subject to" the Interstate Commerce Act only when providing interstate common

8    carrier services, and not otherwise.  For example, in *ICC v. Goodrich Transit Co.*, 224 U.S. 194

9    (1912), a common-carrier railroad also owned amusement parks, bowling alleys, and other non-

10   carriage business.  *Id.* at 205.  The Court recognized that, although the ICC could impose

11   accounting rules applicable to the entire company, it could not "regulate the affairs of the

12   corporations not within its jurisdiction," such as the entertainment facilities.  *Id.* at 211.

13   Similarly, where a railroad owned coal mines, its non-common carrier activity of transporting its

14   own coal to market for sale was not subject to common carrier regulation by the ICC.  *N.Y., New*

15   *Haven & Hartford R.R. v. ICC*, 200 U.S. 361, 401 (1906); *see also Terminal Taxicab Co. v.*

16   *Kutz*, 241 U.S. 252, 255–57 (1916) (Holmes, J.) (under state public utility law analogous to

17   Interstate Commerce Act, a regulated taxicab company's sideline businesses of running a garage

18   and renting out cars and trucks were not subject to common carrier regulation).  The ICC

19   regulated the railroads' and other transportation companies' compliance with "traditional

20   common-carrier requirements such as nondiscrimination . . . and charging just and reasonable

21   rates," *FTC v. Verity Int'l, Ltd.*, 443 F.3d 48, 57 (2d Cir. 2006), but not lines of business like

22   amusement parks or coal sales.

23        When Congress enacted the Wheeler-Lea Act of 1938, which among other things

24   amended Section 4 of the FTC Act to add a reference to the Communications Act to the

25   definition of "Acts to regulate commerce," *see* Pub. L. 75-447, 52 Stat. 111 (Mar. 21, 1938), the

26   same understanding prevailed.  Just a few years earlier, the Supreme Court had recognized (in

27   *dictum*) that "there is no doubt that common carriers subject to the Interstate Commerce Act may

28   have activities which lie outside the performance of their duties as common carriers and are not

**Opp. to Motion to Dismiss – 14-cv-04785-EMC**                                           **Page 9**

1    subject to the provisions of the Act." *Kan. City S. Ry. v. United States*, 282 U.S. 760, 764

2    (1931).  With respect to communications carriers, the D.C. Circuit later established that where a

3    single firm engages in multiple lines of business, "[i]t is clear that an entity can be a common

4    carrier with respect to only some of its activities" and not others, and thus the term "common

5    carrier" is best used to "indicate not an entity but rather an activity as to which an entity is a

6    common carrier." *Computer & Commc'ns Indus. Ass'n v. FCC*, 693 F.2d 198, 209 & n.59 (D.C.

7    Cir. 1982).

8               **3.    The legislative history of the FTC Act confirms that Congress**

9                       **intended the common carrier exemption to be activity based.**

10            Looking beyond the language and structure of the FTC Act, the legislative history of the

11   common carrier exemption confirms that Congress intended to exempt only common carrier

12   activities from Section 5.  Representative Frederick Stevens of Minnesota, a manager of the

13   House bill that ultimately was enacted as the FTC Act (H.R. 15667), explained the exemption for

14   common carriers subject to the Interstate Commerce Act as follows during debate on the House

15   floor:  "[W]here a railroad company engages in work outside that of a public carrier," it "ought

16   to be under the jurisdiction of this commission in order to protect the public, in order that all of

17   [its] public operations should be supervised."  51 Cong. Rec. 8996 (May 21, 1914).

18   Rep. Stevens emphasized his view that the legislation authorized the FTC to exercise jurisdiction

19   over common carriers' "operations outside of public carriage regulated by the interstate

20   commerce acts."  *Id.*

21            The legislative history of the 1938 Wheeler-Lea Act, which, as noted above, amended the

22   FTC Act to add the Communications Act to the definition of "Acts to regulate commerce,"

23   similarly confirms the activity-based scope of the common carrier exemption.  AT&T claims that

24   "Congress contemplated—*but did not adopt*—statutory language providing that common carriers

25   . . . are excepted . . . under [the FTC] [A]ct *only in respect of their common-carrier operations*."

26   (Motion at 10 (internal quotation marks omitted))  AT&T fails to acknowledge, however, that the

27   language on which it relies was offered not by a member of Congress, but by a witness at a

28   hearing.  And that witness (who was actually a representative of the company then known as

**Opp. to Motion to Dismiss – 14-cv-04785-EMC**                                    **Page 10**

AT&T) testified that the proffered language would clarify—but not change—the meaning of the existing common carrier exemption in the FTC Act, which, he stated, already did not apply to non-common carrier activities.[6]

Specifically, in response to a question from Representative William Cole of Maryland about whether the suggested language would affect the existing scope of the common carrier exemption, the witness replied that it would not:

> All this does is to make it clear that . . . the exception which has always been in the act shall be preserved, and . . . will make clear . . . that where common carriers engage in activities that are not in the common carrier field, beyond the field that the [FCC] is regulating, then and in that case, they are subject to the jurisdiction of the [FTC] . . . ."

Hearing Tr. at 26.  In response to a similar question from Representative Edward Eicher of Iowa, the witness stated that his company's existing "activities outside of the field of communications" were already "subject to the [FTC] Act.  If there is any question about it, this amendment will make it clear."  *Id.* at 27.  Ultimately, Congress did not adopt the company's suggested language. The Conference Committee report makes clear, however, that Congress's addition of the Communications Act as one of the "Acts to regulate commerce" was not intended to change the substantive meaning of the statute.  H.R. Rep. 75-1774, at 9 (1938).

That the final legislation did not include language offered by a witness at a hearing—who also testified that the language did not change existing law—does not, and cannot, demonstrate congressional intent to adopt a status-based exception.[7]  On the contrary, the legislative history supports an activity-based reading of the common carrier exemption.

---

[6]  *To Amend the Federal Trade Commission Act*, Hearing on H.R. 3143 Before the H. Comm. on Interstate & Foreign Commerce, 75th Cong., 1st Sess., at 23–27, 67–68 (Feb. 18–19, 1937) ("Hearing Tr.") (testimony of AT&T attorney Harvey Hoshour).

[7]  Even if the language had been formally proposed and rejected, it would still be unhelpful in ascertaining Congress's intent.  *See Verizon v. FCC*, 740 F.3d 623, 639 (D.C. Cir. 2014) ("[P]ieces of . . . failed legislation tell us little if anything about the . . . meaning" of a statute and provide "an unreliable guide to legislative intent.")

**Opp. to Motion to Dismiss – 14-cv-04785-EMC**                                          **Page 11**

**4.      Courts have adopted the activity-based approach.**

Only one court has directly addressed the question presented in this case, and that court held that the common carrier exemption is activity based.  In *FTC v. Verity International, Ltd*., 194 F. Supp. 2d 270 (S.D.N.Y. 2002), *aff'd*, 443 F.3d 48 (2d Cir. 2006), the district court rejected as "fundamentally erroneous" the claim that "once the FCC licenses an entity as a common carrier, it is a common carrier for all purposes and thus entirely beyond the reach of the FTC." *Id.* at 274.  Instead, consistent with the history of common carriage described above, the court held that "an entity that is a common carrier may engage in a broad range of activities, some integral to its functions as a common carrier and some entirely extraneous to them." *Id.* Thus, "it would make little sense to exempt a carrier's extraneous activities from laws of general application affecting the broad sweep of American business." *Id.*  "[W]hether an entity is a common carrier for regulatory purposes depends on the particular activity at issue." *Id.* at 275. The appellate court affirmed the district court's decision.  Although it ruled on different grounds, the Second Circuit expressed an unqualified endorsement of the district court's rationale.  443 F.3d at 56–58.  Indeed, it observed that the very "notion of some indelible common carrier 'status' . . . is highly questionable." *Id.* at 59 n.4.

The Fourth Circuit addressed a closely analogous exemption in Section 5 and found that it too applied based on an entity's activities, not its status.  In *Crosse & Blackwell Co. v. FTC*, 262 F.2d 600 (4th Cir. 1959), the Fourth Circuit addressed Section 5's exemption for entities subject to the Packers & Stockyards Act, which, during the relevant time period, contained language identical to that in the common carrier exemption, excepting "persons, partnerships or corporations subject to the Packers and Stockyards Act, 1921." *Id.* at 602 & n.2, 605.  The court rejected the claim that, just because a company had some lines of business that were subject to the Packers & Stockyards Act (and had been registered as a meat processor by the Department of Agriculture), it could not be charged with violations of the FTC Act for the company's other lines of business.  The court explained that "there seems no doubt that [Congress] never intended that . . . activity which might be classified as meat packing should insulate all of the other activities of a corporation from the reach of the [FTC]." *Id.* at 605.  Rather, in both the FTC Act

and the Packers & Stockyards Act, Congress intended that "jurisdiction to enforce the antitrust laws [be] left in the Federal Trade Commission, except insofar as the businesses of the stockyard and packing industry, as such, were removed from [its] jurisdiction." *Id.* at 605.  In 1958, Congress had amended the FTC Act's Packers & Stockyards Act exemption, adding an explicit statement that such entities are excepted only "insofar as" they are subject to the Packer & Stockyards Act; the Fourth Circuit explained that the qualification had already applied before that amendment was enacted, and that the new language merely ensured that "[w]hatever doubt there may have been on that score has been removed." *Id.*[8]

  *Crosse & Blackwell* refutes AT&T's argument that because the post-1958 version of the Packers & Stockyard Act exemption contains an "insofar as" clause while the common carrier exemption does not, the common carrier exemption applies to all of the activities of a common carrier, rather than to activities only "insofar as they are subject to" the common carrier provisions of the Communications Act.  (*See* Motion at 11)  *Crosse & Blackwell* also directly contradicts AT&T's claim that because the FTC Act exempts "specific entities" from its coverage, "the common-carrier exception by its terms thus exempts entities, not just certain activities."  (*See id.* at 10)  The Fourth Circuit squarely rejected that interpretation.

  AT&T relies heavily on *FTC v. Miller*, 549 F.2d 452 (7th Cir. 1977), claiming that the court there adopted a status-based interpretation of the common carrier exemption.  (*See* Motion at 12–13)  Read properly, however, *Miller* does not support AT&T's position.  In *Miller*, the FTC charged a motor carrier—a common carrier subject to the Interstate Commerce Act—with falsely advertising common carrier services.  The FTC asserted that because false advertising is not itself a common carrier service, it was subject to FTC enforcement.  The court rejected that approach, finding instead that a company that had the status of a common carrier subject to the Interstate Commerce Act was exempt from FTC enforcement for all of its activities conducted in

---

[8]  The FTC itself interpreted the Packers & Stockyards Act exemption the same way.  In *In re Giant Food, Inc.*, 54 F.T.C. 1881, 1883 (1957), *aff'd*, 307 F.2d 184 (D.C. Cir. 1962), the agency determined that the Packers & Stockyards Act did not exempt the entire grocery store chain from FTC enforcement proceedings even though the chain engaged in some activities that it claimed were subject to the Act.

**Opp. to Motion to Dismiss – 14-cv-04785-EMC**         **Page 13**

that status.  549 F.2d at 456–57.  That is what the court meant when it stated that the common carrier exemption "is in terms of status as a common carrier subject to the Interstate Commerce Act, not activities subject to regulation under that Act."  *Id.* at 455.

The court expressly did not reach the question presented here: whether a company's non-common carrier activities are exempt from FTC enforcement merely because the company also provides common carrier service.  To the contrary, the court stated that it "need not decide whether the FTC is correct in its statement that the non-carrier activities of a common carrier do not fall within the scope of the . . . exemption."  *Id*. at 458.  Even if that were the case, the court explained, "it does not follow that a corporation engaged solely in carrier activities steps outside the exemption whenever those activities are not of a type ordinarily regulated by the [Interstate Commerce Commission]."  *Id.*  Here, of course, AT&T is not solely a common carrier.  It also provides services that are not common carrier services—including the services that are the subject of this FTC enforcement action.  *Miller* expressly did not address whether a company's general "status" as a common carrier for one service exempts it from FTC enforcement for its other services.

In any event, *Miller* involved a transportation common carrier under the Interstate Commerce Act, *id.* at 454, while this case involves a communications common carrier under the Communications Act.  Unlike the Interstate Commerce Act in effect at the time of *Miller*, the Communications Act expressly states that a company that provides private mobile services may not be treated as a common carrier "insofar as" it is engaged in providing such services. 47 U.S.C. § 332(c)(2).

AT&T also contends that in past cases the FTC "has not hesitated to advance [a] status-based argument when doing so leads to an expansion of its jurisdiction."  (*See* Motion at 13)  In every instance cited by AT&T (Motion at 13–14), however, the FTC argued, and the court found, that the relevant Section 5(a)(2) exemption did not apply because the entity seeking to invoke it did not—in any aspect of its business—engage in the core activity that would trigger

1    the exemption.[9]  For example, in *Official Airline Guides v. FTC*, 630 F.2d 920 (2d Cir. 1980), the

2    defendant did not qualify for the air carrier exemption not simply because it did not have carrier

3    "status," but more fundamentally because it did not actually transport people through the air.  *See*

4    *id.* at 923.  That logic is consistent with the FTC's position in the instant matter:  The common

5    carrier exemption is triggered when a company is *both* a common carrier in some aspect of its

6    business *and* the activity at issue is subject to the Communications Act's common carriage

7    obligations.  AT&T does provide a common carrier service (mobile voice), but the activity at

8    issue here (mobile data) is not a common carrier service.

9            5.      **A status-based interpretation of the common carrier exemption would**

10                   **undermine the purpose of the FTC Act and lead to illogical results.**

11           According to the Ninth Circuit, "a major purpose of the Federal Trade Commission Act is

12   to protect consumers from economic injuries."  *FTC v. Pantron I Corp.*, 33 F.3d 1088, 1102 (9th

13   Cir. 1994).  The Supreme Court has warned that "in the absence of an unmistakable directive," a

14   court should not "construe the [FTC] Act in a manner which runs counter to the broad goals

15   which Congress intended it to effectuate."  *FTC v. Fred Meyer, Inc.*, 390 U.S. 341, 349 (1968).

16   In addition, the Ninth Circuit has cautioned courts to avoid statutory interpretations that lead to

17   an "illogical result."  *Los Coyotes Band of Cahuilla & Cupeno Indians v. Jewell*, 729 F.3d 1025,

18   1036 (9th Cir. 2013).  Courts should interpret a statute to avoid "producing absurd results that are

19   inconsistent with the statutory scheme."  *Joffe v. Google, Inc.*, 746 F.3d 920, 930 (9th Cir. 2013).

20   A status-based reading of the common carrier exemption would lead to illogical and absurd

21   results that would undermine the broad consumer protection purpose of the FTC Act.

22           AT&T currently engages in many other activities that typically fall within FTC

23   jurisdiction but that would be walled off by a status-based reading of Section 5.  AT&T markets,

24   among other things, gift cards; consumer electronics that purportedly aid in weight loss and air

25   quality; and a home security and automation service that could have enormous implications for

26   ───────────────

27       [9]  AT&T writes that "the FTC successfully argued that a non-common carrier engaged in
     common carrier-like activities is not entitled to the benefit of the jurisdictional exemption"
     (Motion at 13), but the cases cited by AT&T do not involve the common carrier exemption, but

28   rather other exemptions in Section 5(a)(2).

**Opp. to Motion to Dismiss – 14-cv-04785-EMC**                                          **Page 15**

consumer privacy and data security.[10]  It does not make sense that these activities, which fall

squarely within the FTC's experience and expertise,[11] should be cut off from FTC action.[12]  *See*

*Verity*, 194 F. Supp. 2d at 274 ("[I]t would make little sense to exempt a carrier's extraneous

activities from laws of general application affecting the broad sweep of American business.").

More broadly, AT&T's reading of the common carrier exemption would open a giant

loophole that would threaten to swallow the FTC Act.  Companies engaging in *de minimus*

common carrier activity could immunize all of their operations from FTC scrutiny.  For example,

internet giants that introduce a small measure of common carrier business would be shielded

from the FTC's active privacy and data security enforcement because of their "status" as a

common carrier.  Indeed, such a move into common carrier activities is not merely hypothetical;

Google recently announced its intention to become a virtual wireless carrier.[13]

It is also conceivable that a large corporation with diverse business activities would use

this new loophole to escape FTC oversight of its marketing and privacy practices.  Minor

changes in corporate structure could lead to major changes in FTC jurisdiction.  Companies that

---

[10]  Links to product descriptions available in TOA.  AT&T claims that the Fitbit Flex Wristband "tracks . . . calories burned," and that the Netatmo Urban Weather Station and Air Quality Sensor helps you "prevent unhealthy, stagnant indoor air by ventilating your home at the right moment."  A reporter attending the recent Consumer Electronics Show concluded that "[w]ith the home, connected car and other items such as connected pill bottles or dog collars, AT&T sees an opportunity to provide a cellular radio to anything."  Roger Cheng, *AT&T's CES splash: It's not about smartphones anymore*, CNET NEWS, Jan. 5, 2015 (link in TOA).

[11]  *See, e.g.*, *In re Jenny Craig, Inc.*, 125 F.T.C. 333 (1998) (consent order) (weight loss); *In re Alpine Indus., Inc.*, 120 F.T.C. 649 (1995) (consent order) (air quality device); *FTC Staff Report on Internet of Things*, Jan. 2015 (privacy and data security issues related to connected devices) (link in TOA).

[12]  In addition, the FTC has, for more than fifteen years, challenged unfair and deceptive conduct in the provision of internet service.  *See, e.g.*, *FTC v. Cyberspace.com, LLC*, 453 F.3d 1196 (9th Cir. 2006); *In re America Online, Inc. & Compuserve Interactive Servs., Inc.*, 137 F.T.C. 117 (2004) (consent order); *In re Juno Online Servs., Inc.*, 131 F.T.C. 1249 (2001) (consent order); *In re WebTV Networks, Inc.*, 2000 FTC LEXIS 171 (Dec. 8, 2000) (consent order); *In re AOL, Inc.*, 125 F.T.C. 403 (1998) (consent order); *In re CompuServe, Inc.*, 125 F.T.C. 451 (1998) (consent order); *In re Prodigy, Inc.*, 125 F.T.C. 430 (1998) (consent order).

[13]  Brian Fung, *Google could become a wireless carrier*, WASH. POST, Jan. 22, 2015 (link in TOA).

**Opp. to Motion to Dismiss – 14-cv-04785-EMC**                                              **Page 16**

1   routinely engage in fraud could inoculate themselves from FTC scrutiny through the same

2   mechanism: for example, a financial scammer who became a reseller of wireless telephone

3   service would be immune from enforcement.  It is nonsensical to conclude that Congress

4   intended a broad, public interest statute such as the FTC Act to be eviscerated by a narrow

5   jurisdictional exemption.

6        **B.      AT&T itself has previously recognized that its provision of mobile data is**

7                  **subject to the FTC Act.**

8        Despite its current claim that the FTC has no power over its provision of mobile internet

9   access service, AT&T recently took the exact opposite position in an administrative proceeding.

10  In 2010, the FCC called for public comment on a proposal to reclassify the provision of

11  broadband internet access service from a non-common carrier service to a common carrier

12  service.  AT&T submitted comments to the FCC strongly opposing that switch, and in doing so

13  made arguments that are precisely the opposite of the arguments it advances in its Motion.

14       **1.      AT&T's current arguments to the Court contradict its past**

15                 **arguments to the FCC.**

16       By way of background, the FCC has classified fixed and mobile broadband internet

17  access services as non-common carrier "information services."[14]  As a result, broadband

18  providers such as AT&T are free to offer broadband internet access without regard to the

19  common carrier requirements of the Communications Act (including, for example, the

20  requirement to offer those services in a manner that is "just and reasonable," 47 U.S.C.

21  § 201(b)).  On June 17, 2010, the FCC issued a Notice of Inquiry seeking comment on "whether

22  the current information service classification of broadband Internet service" still enabled the

23  FCC to perform its "core responsibilities," and on the "practical consequences of classifying the

24  Internet connectivity component of broadband Internet service as a 'telecommunications service'

25  to which the full weight of Title II requirements would apply."  *Framework for Broadband*

26  *Internet Service*, Notice of Inquiry, 25 FCC Rcd 7866, 7878 (¶ 28) (2010).

27  

28       [14]  *See, e.g.*, *Appropriate Framework for Broadband Access to the Internet Over Wireline Facilities*, Report and Order, 20 FCC Rcd 14853 (2005), *aff'd sub nom. Time Warner Telecom, Inc. v. FCC*, 507 F.3d 205 (3d Cir. 2007); *Brand X*, 545 U.S. at 992.

**Opp. to Motion to Dismiss – 14-cv-04785-EMC**                                              **Page 17**

In response, AT&T filed comments arguing strongly that the FCC should not reclassify any portion of broadband internet access as a common carrier service, and that doing so would disserve the FCC's goals and the public interest. *See* AT&T Comments, *In the Matter of Framework for Broadband Internet Service*, GN Docket No. 10-127 (filed July 15, 2010) ("AT&T Comments") (link in TOA); AT&T Reply Comments GN Docket No. 10-127 (filed Aug. 12, 2010) (link in TOA). In particular, AT&T argued that "the FTC has considerable authority to eliminate 'unfair business practices' under section 5 of the FTC Act," and that "the proposed reclassification could divest the FTC of any jurisdiction over broadband Internet access providers by presumably placing them squarely within the 'common carrier' exception to the FTC's section 5 jurisdiction." AT&T Comments at 13.

AT&T now contends that the present enforcement action is beyond the authority of the FTC, in part due to the purported overlap with the FCC's transparency and public disclosure rules. (Motion at 2, 15) Yet in its comments to the FCC, AT&T argued that FCC regulation of internet access as a common carrier service was unwarranted due to the FTC's existing "oversight over transparency in the Internet ecosystem," and the fact that "[t]he FTC has and regularly exercises its enforcement authority with respect to transparency and consumer disclosures relating to Internet services." AT&T Comments at 29. In support of this contention, AT&T cited a past FTC investigation concerning mobile data, *id.* at 29 n.49, and argued that the FTC's effective enforcement in this context made the FCC's "Title II [common carrier] reclassification [proposal] in pursuit of that same objective not only unnecessary but counterproductive, since it could strip the FTC of any such authority." *Id.* at 30.

AT&T also argued that the FTC had authority to "protect privacy *throughout* the Internet ecosystem," including in the context of broadband internet access services, and that FCC reclassification of those services as common carrier services could "precipitously impede FTC involvement" because doing so could "exempt those services from the FTC's section 5 jurisdiction." *Id.* at 35. And AT&T reassured the FCC that "no agency has more relevant expertise than the FTC in ensuring the transparency and accuracy of broadband provider disclosures to consumers." *Id.* at 20. "Yet, ironically, the proposed Title II reclassification could

*divest* the FTC of any authority in this area by holding that broadband Internet access service is subject to 'common carrier' regulation after all—and thus may fall squarely within the section 5 common-carrier exemption." *Id.* AT&T greatly compounds that "irony" by making the opposite argument here—i.e., that its broadband internet access service is already fenced off from FTC authority due to the Section 5 common carrier exemption.

AT&T has therefore been on both sides of this debate, and the arguments the company made to the FCC in favor of FTC jurisdiction in 2010 are far stronger than the arguments it makes to the Court against FTC jurisdiction now.

> **2.      The FTC has consistently asserted jurisdiction over mobile data and other non-common carrier services, regardless of a service provider's "status."**

In contrast to AT&T, the FTC has consistently and publicly taken the position that it has legal authority over broadband internet access services, and that the common carrier exemption does not affect the FTC's authority, regardless of the "status" of the service provider. For example, in a 2006 appearance before the Senate Committee on the Judiciary, Commissioner William Kovacic testified that the FTC "has jurisdiction under the FTC Act over broadband Internet access services offered on a non-common carrier basis, including . . . wireless Internet access services."[15] He went on to say that, "[t]o the extent an entity provides non-common carrier services . . . , the FTC considers the provision of those services to be subject to the FTC Act's prohibitions against engaging in deceptive or unfair practices and unfair methods of competition."[16] The FTC staff report, *Broadband Connectivity Competition Policy*, issued in June 2007, observes that, "because most broadband Internet access services are not provided on a common carrier basis, they are part of the larger economy subject to the FTC's general

---

[15] *FTC Jurisdiction Over Broadband Internet Access Services*, Prepared Statement of the Federal Trade Commission to U.S. Senate Committee on the Judiciary, presented by Commissioner William E. Kovacic, June 14, 2006 (link in TOA).

[16] *Id.* at 3 n.4.

**Opp. to Motion to Dismiss – 14-cv-04785-EMC**                                    **Page 19**

competition and consumer protection authority."[17]  This 2007 report was clairvoyant in its

discussion of the applicability of consumer protection laws to broadband internet access services.

It identifies as potentially deceptive the failure to clearly and conspicuously disclose upload and

download speeds and limitations on bandwidth usage.  Broadband Report at 130–32.  The report

also identifies as potentially unfair the unilateral change of contract where consumers "expect a

consistent level of service throughout the contract period." *Id.* at 134.  These two theories of

violation roughly coincide with the two counts in the FTC's Complaint.  (*See* Complaint ¶¶ 45–

49)

        Moreover, the FTC has acted in accordance with its stated view on the common carrier

exemption in the context of internet services.  The FTC recently reached a settlement with

another wireless provider of both mobile data and voice services, TracFone Wireless, Inc., that

was allegedly engaged in throttling practices comparable to those at issue in this matter.  *FTC v.

TracFone Wireless, Inc.*, Case No. 3:15-cv-00392 (N.D. Cal. Jan. 28, 2015) (complaint).  The

proposed stipulated order is currently before the Court.  *Id.* (stipulated proposed order).

        Similarly, looking beyond broadband, the FTC has asserted jurisdiction over other non-

common carrier services of companies that also engage in common carriage.  Most recently, the

FTC, in a joint action with the FCC and the states, reached a settlement with T-Mobile over

allegations of cramming.  *FTC v. T-Mobile USA, Inc.*, No. 2:14-cv-00967-JLR (W.D. Wa. July 1,

2014) (complaint).

        The statements by FTC Commissioners cited by AT&T—which supposedly "foreclose[]"

an activity-based reading of the common carrier exemption (*see* Motion at 15–16)—do no such

thing.  For example, AT&T cites the 2002 testimony of Commissioner Sheila Anthony (*see id.*),

even though Commissioner Anthony testified that the FTC "firmly believes that only the

common carrier activities of [telecom firms] are exempted."[18]  Her observation about litigating

---

[17]  *FTC Staff Report on Broadband Connectivity Competition Policy*, June 2007, at 38
("Broadband Report") (link in TOA).

[18]  *FTC Reauthorization: Hearing Before the Subcommittee on Consumer Affairs,
Foreign Commerce and Tourism of the Senate Committee on Commerce, Science, and
Transportation*, 107th Cong., at 28 (link in TOA).

**Opp. to Motion to Dismiss – 14-cv-04785-EMC**                                    **Page 20**

1  the common carrier issue, given the current posture of the instant matter, merely looks

2  prescient.[19]

3    **C.  FCC jurisdiction over mobile data does not preclude FTC jurisdiction.**

4    AT&T contends that its throttling program should be exempt from FTC scrutiny because

5  those practices are also subject to regulation by the FCC.  Of course, overlapping jurisdiction is a

6  common feature of federal law enforcement, and the existence of one agency's jurisdiction does

7  not nullify other legal regimes addressing the same conduct.  AT&T is unable to identify any

8  actual conflict it would face in complying with both FCC rules and the FTC Act in its provision

9  of mobile data.  Accordingly, this line of argument fails.

10    **1.  Overlapping jurisdiction is both common and permissible.**

11    Congress and the courts have recognized the legitimacy of "overlapping agency

12  jurisdiction under different statutory mandates."  *FTC v. Texaco, Inc.*, 555 F.2d 862, 881 (D.C.

13  Cir. 1977) (en banc).  The FTC "may proceed against unfair practices even if those practices

14  [also] violate some other statute."  *FTC v. Accusearch, Inc.*, 570 F.3d 1187, 1195 (10th Cir.

15  2009) (referring to the Communications Act).  "[T]he cases recognize that ours is an age of

16  overlapping and concurring regulatory jurisdiction."  *Thompson Med. Co. v. FTC*, 791 F.2d 189,

17  192–93 (D.C. Cir. 1986).  More broadly, "when two statutes are capable of co-existence, it is the

18  duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard

19  each as effective."  *Morton v. Moncari*, 417 U.S. 535, 551 (1974).

20    Indeed, given the wide reach of the FTC Act, overlapping jurisdiction is more the rule

21  than the exception.  Antitrust law is generally subject to enforcement by both the FTC and the

22  Department of Justice ("DOJ"), and the FCC also has oversight regarding certain types of

23  mergers.  The FTC and the Food and Drug Administration ("FDA") share jurisdiction in the

24  areas of food, drugs, and cosmetics.  The FTC and the Consumer Financial Protection Bureau

25  ("CFPB") share jurisdiction over financial practices.  And the list goes on.

26  _____

27    [19]  Of course, the FTC has favored repeal of the common carrier exemption not merely to avoid having to litigate its existing authority over non-common carrier services, but primarily to broaden its authority to include unfair and deceptive conduct in the provision of common carrier services.  *See id.* at 27.

28

**Opp. to Motion to Dismiss – 14-cv-04785-EMC**       **Page 21**

The FTC has entered a formal memorandum of understanding ("MOU") with many agencies, including the FCC, the DOJ, the FDA, and the CFPB.[20]  The whole point of an MOU is the recognition of overlapping jurisdiction, and the need for orderly cooperation and coordination among federal agencies.  If FTC jurisdiction extended only to the border of another agency's primary field, its general mandate to protect consumers would be hopelessly undermined.

> **2.    The FCC and the FTC have a history of orderly cooperation and coordination.**

The FCC and the FTC, in particular, have a long history of cooperating and coordinating in their areas of shared jurisdiction.  The two agencies seek to vindicate different statutory mandates with different investigatory tools and legal remedies, but have nonetheless worked together to the benefit of consumers.  As noted above, the FCC and the FTC, along with the states, recently announced a settlement with T-Mobile over charges related to cramming.[21]  In addition, the FCC and FTC cooperated extensively in implementing the National Do Not Call Registry and continue to cooperate on enforcement of the Do Not Call rules, pursuant to an MOU signed by staff of the two agencies.[22]  Similarly, the agencies have collaborated in efforts to address concerns raised by phone pretexters obtaining consumers' calling records without authorization.[23]

---

[20]  *See, e.g.*, *Annual Report to Congress for FY 2003 and 2004 Pursuant to the Do Not Call Implementation Act on Implementation of the National Do Not Call Registry* (FCC) (MOU in appendix) (link in TOA); *Working Agreement Between FTC and Food and Drug Admin.*, 4 Trade Reg. Rep. (CCH) ¶ 9,850.01 (1971) (FDA); *Memorandum of Understanding Between the Consumer Financial Protection Bureau and the Federal Trade Commission*, Jan. 23, 2012 (CFPB) (link in TOA).

[21]  *T-Mobile to Pay At Least $90 Million, Including Full Consumer Refunds To Settle FTC Mobile Cramming Case*, FTC press release, Dec. 19, 2014 (link in TOA).

[22]  *See Annual Report to Congress for FY 2003 and 2004 Pursuant to the Do Not Call Implementation Act on Implementation of the National Do Not Call Registry* (link in TOA).

[23]  *See Prepared Statement of the Federal Trade Commission Before the Committee on Energy and Commerce, United States House of Representatives*, Combating Pretexting: H.R. 936, Prevention of Fraudulent Access to Phone Records Act, Mar. 9, 2007, at 4 (link in TOA).

3.    There is no conflict between the FCC's rules and this FTC
enforcement action.

AT&T fails to identify any actual conflict between the FCC's rules and the FTC's
Complaint.  The Transparency Rule, which the FCC adopted in the *Open Internet Order*[24] and
the D.C. Circuit affirmed, requires a broadband service provider to "disclose accurate
information regarding the network management practices, performance, and commercial terms of
its broadband Internet access services sufficient for consumers to make informed choices
regarding use of such services . . . ."  47 C.F.R. § 8.3; *see Verizon*, 740 F.3d at 659.  The FTC
Act does not impose mandatory disclosures, but it does require that companies adequately
disclose information necessary to keep their advertising claims from being deceptive; for
example, when advertising "unlimited data," adequately disclosing that the data plan includes a
data speed restriction.  It also prohibits companies from unilaterally altering the terms of their
agreement with customers.  It is difficult to envision any scenario in which the company would
be unable to comply with both of these legal requirements simultaneously.  AT&T does not, for
example, suggest that the Transparency Rule requires the company to disseminate a claim that
would be deceptive under the FTC Act.

Since AT&T cannot establish that it would be whipsawed by these two enforcement
regimes, AT&T cannot plausibly assert that compliance with one leaves it free to violate the
other.  Indeed, the FCC explicitly acknowledged, in the context of the *Open Internet Order*, that
its rules were "not intended to expand or contract broadband providers' rights or obligations with
respect to other laws," and "open Internet protections can and must coexist with . . . other legal
frameworks."  25 FCC Rcd at 17962–63 (¶ 107).

AT&T not only relies on the *Open Internet Order*'s Transparency Rule, but also contends
that its throttling practices should be exempt from FTC scrutiny because they are "consistent
with the FCC Open Internet principles and rules" regarding "reasonable network management."[25]

---

[24]    *Preserving the Open Internet*, Report and Order, 25 FCC Rcd 17905 (2010), *rev'd in
part and aff'd in part sub nom. Verizon v. FCC*, 740 F.3d 623 (D.C. Cir. 2014).

[25]    The rules adopted in the *Open Internet Order* provided that a "network management
practice is reasonable if it is appropriate and tailored to achieving a legitimate network

(Motion at 2, 15)  AT&T's discussion of reasonable network management is a red herring.

Reasonable network management is irrelevant to compliance with the Transparency Rule:  The

Rule does not even mention reasonable network management since a provider may be liable for

failing to properly disclose a network management practice even if the practice is "reasonable."

*See* 47 C.F.R. § 8.3.  Rather, the FCC's *Open Internet Order* includes "reasonable network

management" only as a defense against allegations that a broadband provider's practices violate

the No Blocking and No Unreasonable Discrimination Rules.  47 C.F.R. §§ 8.5, 8.7.  Both of

those rules were vacated on appeal and are no longer in effect.  *See Verizon*, 740 F.3d at 653–55.

### 4.    Congress did not intend to divide responsibility along industry lines.

Finally, AT&T is wrong in contending that the FTC is ousted of jurisdiction because the

FCC also exercises some authority over private mobile services.  Invoking out-of-context

language from some judicial decisions, AT&T contends that Congress meant to neatly "divid[e]

regulatory responsibilities along industry lines" and deem the FCC as "the single Government

agency with uniform jurisdiction and regulatory power over all forms of electrical

communication, whether by telephone, telegraph, cable or radio."  (Motion at 12 (citing *Miller*,

549 F.2d at 459, and *United States v. Sw. Cable Co.*, 392 U.S. 157, 167–68 (1968)))

If that were really Congress's intent, it could have exempted from the FTC's authority

everything subject to the Communications Act or the FCC's jurisdiction.  But it did not do so.

By phrasing the exemption more narrowly, in terms of common carriers subject to the

Communications Act, Congress made it clear that both the FTC and the FCC would have

concurrent authority over other industries pervasively regulated by the FCC—such as provision

---

management purpose, taking into account the particular network architecture and technology of
the broadband Internet access service."  47 C.F.R. § 8.11(d); *Open Internet Order*, 25 FCC Rcd
at 17952 (¶ 82).  Under those rules, mobile broadband internet access providers' obligations not
to "block consumers from accessing lawful websites" or to "block applications that compete with
the provider's voice or video telephony services" were "subject to reasonable network
management"—i.e., a mobile data provider could defend against a charge that its practice
violated the No Blocking rule by showing that the practice constituted "reasonable network
management."  47 C.F.R. §8.5; *see also Open Internet Order*, 25 FCC Rcd at 17951–56, 17961
(¶¶ 80–92, 103).

**Opp. to Motion to Dismiss – 14-cv-04785-EMC**                                      **Page 24**

1   of radio or TV broadcasting, as well as other services that use dedicated radio frequencies subject

2   to licenses under Title III of the Communications Act.

3          In any event, this argument proves too much.  As mentioned, the FTC has exercised its

4   Section 5 authority over internet service providers for more than fifteen years.  AT&T's

5   argument would call into question this entire line of cases.

6   **V.     CONCLUSION**

7          The relevant statutes and the court opinions interpreting them, as well as the legislative

8   intent and statutory purposes underlying them, all point to the same conclusion:  The common

9   carrier exemption should be read as a narrow, activity-based exception to the broad mandate of

10  the FTC Act.  To find otherwise would weaken protections for consumers and lead to illogical

11  and unintended real-world consequences.  The common carrier exemption does not apply to

12  AT&T's unfair and deceptive conduct towards its unlimited customers.

13

14         Dated:  Feb. 4, 2015                    Respectfully submitted,

15                                                 DAVID C. SHONKA
16                                                 Acting General Counsel

17                                                 _____/s/ Evan Rose_____
18                                                 EVAN ROSE
                                                   MATTHEW D. GOLD
19                                                 LAURA FREMONT
                                                   ERIC EDMONDSON
20                                                 KERRY O'BRIEN
21                                                 DAVID M. NEWMAN
                                                   LINDA K. BADGER
22
23                                                 Attorneys for Plaintiff
                                                   FEDERAL TRADE COMMISSION
24

25

26

27

28

**Opp. to Motion to Dismiss – 14-cv-04785-EMC**                                   **Page 25**