**United States District Court**
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FEDERAL TRADE COMMISSION, | No. C-14-4785 EMC |
| Plaintiff, | |
| v. | **ORDER DENYING DEFENDANT'S MOTION TO DISMISS** |
| AT&T MOBILITY LLC, | **(Docket No. 29)** |
| Defendant. | |
| _____/ | |

The Federal Trade Commission ("FTC") has filed suit against Defendant AT&T Mobility LLC ("AT&T"), asserting that AT&T has engaged in acts or practices, in connection with the marketing of mobile data services,[1] that violate 15 U.S.C. § 45(a). Section 45(a), which is part of the Federal Trade Commission Act of 1914 ("FTC Act"), provides in relevant part: "The Commission is hereby empowered and directed to prevent persons, partnerships, or corporations, except . . . common carriers subject to the Acts to regulate commerce . . . , from using . . . unfair or deceptive acts or practices in or affecting commerce." 15 U.S.C. § 45(a)(2).

Currently pending before the Court is AT&T's motion to dismiss. AT&T argues that it cannot be held liable for a violation of § 45(a) because it enjoys an exemption under the statute as a "common carrier[] subject to the Acts to regulate commerce." *Id.* Having considered the parties' briefs and accompanying submissions, the Court hereby **DENIES** AT&T's motion.

---

[1] As indicated below, AT&T provides both mobile *voice* services and mobile *data* services. The FTC's complaint concerns only the provision of mobile data services.

**United States District Court**
For the Northern District of California

## I.   FACTUAL & PROCEDURAL BACKGROUND

In its complaint, the FTC alleges as follows.

"[AT&T] is a major retailer of smartphones and provider of wireless broadband internet access service for smartphones ('mobile data')."  Compl. ¶ 9.  In 2007, AT&T was the exclusive mobile data provider for the Apple iPhone.  Initially, AT&T offered iPhone customers an "unlimited" mobile data plan.  *See* Compl. ¶ 10.

In 2010, AT&T stopped offering the unlimited mobile data plan to new smartphone customers and instead has required such customers to purchase one of its "tiered" mobile data plans (where customers who exceed the stated data allowance are charged for the additional data at the rate set forth in the tiered mobile data plan).  *See* Compl. ¶ 11.  Old customers, however, were grandfathered – in essence, to ensure that they would not switch mobile data providers.  *See* Compl. ¶¶ 12-13.

In July 2011, AT&T

> decided to begin reducing the data speed for unlimited mobile data plan customers, a practice commonly known as "data throttling." Under [the] throttling program, if an unlimited mobile data plan customer exceeds the limit set by [AT&T] during a billing cycle, [AT&T] substantially reduces the speed at which the customer's device receives data for the rest of that customer's billing cycle.

Compl. ¶ 15.

> The speed reductions and service restrictions in effect under [the] throttling program are not determined by real-time network congestion at a particular cell tower.  Throttled customers are subject to this reduced speed even if they use their smartphone at a time when [AT&T's] network has ample capacity to carry the customers' data, or the use occurs in an area where the network is not congested.

Compl. ¶ 26.  Moreover, "[AT&T] does not throttle its tiered mobile data plan customers, regardless of the amount of data that a tiered mobile data plan customer uses."  Compl. ¶ 29.

According to the FTC,

> [AT&T] has numerous alternative ways to reduce data usage on its network that does not involve violating its promise to customers.  One alternative would involve [AT&T] requiring existing unlimited data customers to switch to a tiered data plan at renewal. . . . Another alternative would involve [AT&T] introducing its throttling program

**United States District Court**
For the Northern District of California

> at renewal, with disclosures at point of sale. . . . Yet other alternatives might include limited, narrowly tailored throttling programs that are consistent with Defendants' contracts, advertising, and other public disclosures.

Compl. ¶ 28.

But "[AT&T's] wireless customer agreements do not state that an unlimited mobile data plan customer's use of more than a specified amount of data is prohibited activity." Compl. ¶ 32. Also, at the time of renewal, AT&T does not tell its unlimited mobile data plan customers about the throttling program. *See* Compl. ¶ 34. Disclosures about the throttling program have been limited – *e.g.*, in a monthly bill sent prior to renewal, in a text message, and/or in an e-mail. *See* Compl. ¶¶ 33-37 (noting that only a minority of customers were sent a text message and/or e-mail). These disclosures, however, were not adequate. For example, the monthly

> statement failed to disclose the degree to which the customers' data speed would be reduced, and the impact that the reduced speed would have on customers' ability to use their device. It also failed to adequately disclose that the speed reduction was due to a limit intentionally imposed by [AT&T], as opposed to general network congestion.

Compl. ¶ 35.

Based on, *inter alia*, the above allegations, the FTC has brought two claims pursuant to 15 U.S.C. § 45(a) which prohibits, *inter alia*, "unfair or deceptive acts or practices in or affecting commerce." 15 U.S.C. § 45(a)(2). In Count I, the FTC asserts that AT&T's throttling program is *unfair* because AT&T "entered into numerous mobile data contracts that were advertised as providing access to unlimited mobile data, and that do not provide that [AT&T] may modify, diminish, or impair the service of customers who use more than a specified amount of data for permissible activities." Compl. ¶ 45. In Count II, the FTC maintains that AT&T has engaged in *deceptive* conduct because it does not disclose or fails to adequately disclose that "it imposes significant and material data speed restrictions on unlimited mobile data plan customers who use more than a fixed amount of data in a given billing cycle." Compl. ¶ 49. In short, the gravamen of the FTC's complaint is not AT&T's practice of throttling per se, but AT&T's deceptive conduct in failing to disclose its throttling to certain customers.

3

**United States District Court**
For the Northern District of California

## II.   DISCUSSION

A.   Legal Standard

AT&T has moved to dismiss on the basis that it is exempt from § 45(a) as a "common carrier[] subject to the Acts to regulate commerce." 15 U.S.C. § 45(a)(2). In its opening brief, AT&T styled its motion as one made pursuant to Federal Rule of Civil Procedure 12(b)(1), *i.e.*, for lack of subject matter jurisdiction. In its opposition, the FTC counters that the motion is appropriately brought under Rule 12(b)(6), not 12(b)(1), because AT&T is challenging only "the scope of the FTC's statutory authority." Opp'n at 2 n.1.

Whether the pending motion to dismiss is technically predicated on Rule 12(b)(1) or on 12(b)(6) is not material in this instance. Neither party has asserted that the choice of rule affects the disposition of the motion. Nor can the Court divine a difference in result here. Even assuming that Rule 12(b)(1) were to govern, AT&T is making a facial challenge to jurisdiction, and not a factual one. *See Lacano Invs., LLC v. Balash*, 765 F.3d 1068, 1071 (9th Cir. 2014) (indicating that a jurisdictional attack can be facial or factual; in the former circumstance, all of the factual allegations in the complaint are taken as true and extrinsic evidence such as documents attached to a complaint may be considered). Given such a challenge, the standard is governed essentially by a Rule 12(b)(6)-type inquiry.

While the exact procedural posture is not dispositive, the Court acknowledges that recent action taken by another administrative agency, namely, the Federal Communications Commission, may impact this case. More specifically, the Federal Communications Commission recently made the decision to reclassify mobile data service from a non-common carriage service to a common carriage service. Because this "Reclassification Order" has not yet taken effect, the Court addresses first the merits of the issues raised in the parties' initial briefs. Only after assessing the merits of these issues does the Court turn to the effect of the Reclassification Order on this action.

B.   Statutory Construction

As stated above, AT&T argues that it cannot be held liable for a violation of § 45(a) because of an exception in the statute for "common carriers subject to the Acts to regulate commerce." 15 U.S.C. § 45(a)(2). The full text of § 45(a) is as follows:

United States District Court

For the Northern District of California

> The Commission is hereby empowered and directed to prevent persons, partnerships, or corporations, *except* banks, savings and loan institutions described in section 18(f)(3) [15 U.S.C. § 57a(f)(3)], Federal credit unions described in section 18(f)(4) [15 U.S.C. § 57a(f)(4)], *common carriers subject to the Acts to regulate commerce*, air carriers and foreign air carriers subject to the Federal Aviation Act of 1958 [49 U.S.C. § 40101 *et seq.*], and persons, partnerships, or corporations insofar as they are subject to the Packers and Stockyards Act, 1921, as amended [7 U.S.C. § 181 *et seq.*], except as provided in section 406(b) of said Act [7 U.S.C. § 227(b)], from using unfair methods of competition in or affecting commerce and unfair or deceptive acts or practices in or affecting commerce.

15 U.S.C. § 45(a)(2) (emphasis added). The term "Acts to regulate commerce" is defined as the Interstate Commerce Act of 1887 and the Communications Act of 1934, as well as all amendments and supplements thereto. *See id.* § 44. When § 45(a) was first enacted as part of the FTC Act in 1914, "Acts to regulate commerce" meant only the Interstate Commerce Act because the Communications Act had not yet been passed.

The Interstate Commerce Act was "[t]he first federal regulation to impose duties on common carriers" and "applied to 'any common carrier or carriers' engaged in the railroad transportation of people or property interstate." *FTC v. Verity Int'l, Ltd.*, 443 F.3d 48, 57 (2d Cir. 2006). "In 1910, Congress passed the Mann-Elkins Act, which amended the [Interstate Commerce Act] to apply to interstate telephone companies and to deem such companies common carriers." *Id.* "Regulation of telephone common carriers continued to rest with the [Interstate Commerce Commission] until 1934, when Congress passed the Communications Act of 1934." *Id.*; *see also Verizon Comms., Inc. v. FCC*, 535 U.S. 467, 478 n.3 (2002) (noting that "[f]ederal regulation in the area had previously been undertaken incidentally to general interstate carrier regulation under the Interstate Commerce Act"). When § 45(a) was amended in 1938, one of the amendments made was to re-define "Acts to regulate commerce" to include the Communications Act.

The basic dispute between the parties is over the scope of the common carrier exception. According to AT&T, it falls within the scope of the exception because the exception applies so long as an entity has the "status" of a common carrier. In other words, under AT&T's position, if an entity has the status of a common carrier, it cannot be regulated under § 45(a) at all, even when it is providing services *other* than common carriage services. The FTC disagrees with this interpretation

5

United States District Court

For the Northern District of California

of § 45(a).  According to the FTC, it is not just status that matters, but also the "activity" in question. That is, the common carrier exception applies only if an entity has the status of a common carrier *and* is actually engaging in common carriage services.  Thus, under the FTC's view, an entity can be regulated under § 45(a) even if the entity is a common carrier so long as it is the entity's non-common carriage services that are being regulated.

The basic issue for the Court is one of statutory construction.  Statutory construction begins, of course, with the language of the statute.  *See, e.g.*, *Caraco Pharm. Labs., Ltd. v. Novo Nordisk A/S*, 132 S. Ct. 1670, 1680 (2012) (noting that statutory construction begins "'with the language of the statute itself'"); *United States v. Byun*, 539 F.3d 982, 991 (9th Cir. 2008) (indicating that ordinary tools of statutory construction include the language of the statute, the statute's legislative history, and the "practical effects to the extent necessary to illuminate the meaning of the plain language").  Here, § 45(a) carves out an exception for "common carriers subject to the Acts to regulate commerce," which includes the Communications Act.  15 U.S.C. § 45(a)(2).  AT&T argues that this language, on its face, weighs in its favor because: (1) AT&T is a common carrier – *i.e.*, for mobile voice services – even if it does also provide non-common carriage services such as mobile data; and (2) AT&T is subject to the Communications Act, being regulated in fact not just for its common carriage services (mobile voice) under Title II of the act but also for its non-common carriage services (mobile data) under Title III of the act.

The problem with AT&T's argument is it glosses over what is meant by "common carrier" in the first place.  Nowhere in the FTC Act is the term "common carrier" defined.  Given that fact, the Court deems it appropriate to consider what the term "common carrier" meant at the time the FTC Act was enacted in 1914.  Notably, that is the approach that the Second Circuit took in a decision addressing the common carrier exception in § 45(a).  *See Verity*, 443 F.3d at 57-58 ("decid[ing] to give meaning to 'common carrier' in the FTC Act according to the ordinary sense of the word when Congress used it to create the exemption").

As the FTC points out, prior to the enactment of the FTC Act, an entity was deemed a common carrier and regulated as such under the common law only where it was actually engaged in common carriage services.  For example, in *Santa Fe, Prescott & Phoenix Railway Co. v. Grant*

United States District Court

For the Northern District of California

*Brothers Construction Co.*, 228 U.S. 177 (1913), the Supreme Court noted that "[t]he great object of the law governing common carriers was to secure the utmost care in the rendering of a service of the highest importance to the community" and, therefore, a "common carrier *in the prosecution of its business as such* is not permitted to drop its character and transmute itself by contract into a mere bailee with right to stipulate against the consequences of its negligence." *Id.* at 184-85 (emphasis added). The Supreme Court added that "this rule has no application when a railroad company is acting *outside the performance of its duty* as a common carrier." *Id.* at 184-85 (emphasis added); *see also R.R. Co. v. Lockwood*, 84 U.S. 357, 377 (1873) (stating that "[a] common carrier may, undoubtedly, become a private carrier, or a bailee for hire, when, as a matter of accommodation or special engagement, he undertakes to carry something which it is not his business to carry").[2]

Prior to the enactment of the FTC Act, common carriers were viewed in a similar way for purposes of the Interstate Commerce Act.[3] For instance, in *Interstate Commerce Commission v. Goodrich Transit Co.*, the Supreme Court concluded that the Interstate Commerce Commission had authority to require a system of accounting for a common carrier, even though "the accounts required to be kept are general in their nature and embrace business *other* than such as is necessary to the discharge of the duties in carrying passengers in freight in interstate commerce [*e.g.*, amusement parks]"; but the Supreme Court also indicated that those non-common carriage "affairs [were otherwise] not within [the Commission's] jurisdiction." *Goodrich Transit*, 224 U.S. at 211-12

---

[2] At the hearing, AT&T argued that, when the FTC Act was enacted, times were "simpler" in that common carriers (such as railroads) were single purpose entities that engaged in common carriage activity only. But the cases cited above show that that was not the case. For instance, a common carrier could engage in private transportation. *See R.R. Co.*, 84 U.S. at 377 ("For example, if a carrier of produce, running a truck boat between New York City and Norfolk, should be requested to carry a keg of specie, or a load of expensive furniture, which he could justly refuse to take, such agreement might be made in reference to this taking and carrying the same as the parties chose to make . . . ."). Also, a common carrier might be involved in a completely different line of business. *See, e.g.*, *Interstate Commerce Commission v. Goodrich Transit Co.*, 224 U.S. 194, 205 (1912) (noting that a common carrier also operated two amusement parks "and in connection therewith owns, operates and derives revenue from lunch stands, merry-go-rounds, bowling alleys, bath houses, etc., and collects admission fees from people entering the parks").

[3] It is appropriate to consider the Interstate Commerce Act here for at least two reasons. First, the Interstate Commerce Act was "[t]he first federal regulation to impose duties on common carriers." *Verity*, 443 F.3d at 57. Second, the Interstate Commerce Act was expressly referenced in § 45(a) at the time it was enacted.

1    (emphasis added); *see also Kansas City S. R. Co. v. United States*, 282 U.S. 760, 764 (1931) (citing

2    *Santa Fe* in support of the statement that "[t]here is no doubt that common carriers subject to the

3    Interstate Commerce Act may have activities which lie outside the performance of their duties as

4    common carriers and are not subject to the provisions of the Act").

5           Thus, as the FTC argues, at the time the FTC Act was enacted, the term "common carrier"

6    encompassed not only a "status" but also an "activity" component: An entity was deemed a common

7    carrier when it had the status of common carrier *and* was actually engaging in common carriage

8    services.

9           Moreover, even if there were some doubt that "common carrier" was to be so understood, the

10   broader phrase used in § 45(a) for the common carrier exception must be taken into account.

11   Section 45(a) refers to an exemption for "common carriers *subject to the Acts to regulate*

12   *commerce*." 15 U.S.C. § 45(a)(2) (emphasis added). This language can fairly be read to mean that

13   the exemption applies only when the common carrier is subject to regulation as such. *Cf. Verity*,

14   443 F.3d at 57 (stating that Congress created the common carrier exemption because it "did not

15   intend the FTC to enforce unfair-competition law against common carriers because the ICC already

16   regulated common carriers under the Interstate Commerce Act"). As indicated by the case law

17   discussed above, an entity was subject to regulation as a common carrier only when it was actually

18   engaging in common carriage activity. AT&T's interpretation to the contrary is not convincing

19   because in essence, AT&T asks that § 45(a) be broken into two separate inquiries: (1) Is an entity a

20   common carrier (for any purpose)? and (2) if so, is the entity subject to the Acts to regulate

21   commerce? *See* Reply at 4. AT&T does not explain why the Court should apply this two-part

22   disjunctive construction rather than evaluate the exemption holistically.[4]

23   _____

24         [4] Because of its analysis above, the Court need not entertain the FTC's additional argument
     that "common carriers subject to the Acts to regulate commerce" necessarily incorporates by
25   reference the totality of the Communications Act, which defines common carriers as turning on
     whether the entity is actually engaging in common carriage services. *See* 47 U.S.C. § 332(c)(1)-(2)
26   (providing that "[a] person engaged in the provision of a service that is a commercial mobile service
     shall, insofar as such person is so engaged, be treated as a common carrier for purposes of this Act"
27   and further that "[a] person engaged in the provision of a service that is a private mobile service
     shall not, insofar as such person is so engaged, be treated as a common carrier for any purpose under
28   this Act"); *see also* 47 U.S.C. § 153(51) (defining the term "telecommunications carrier" as "any
     provider of telecommunication services" and further providing that "[a] telecommunications carrier

8

**United States District Court**
For the Northern District of California

Furthermore, a holistic interpretation of the common carrier exception is more consistent with the legislative history for the FTC Act.  As the FTC notes, during the 1914 congressional debate over the bill that would later become the FTC Act, Representative Stevens, a manager of the House bill, discussed what entities would be covered by the proposed act.  Mr. Stevens stated, *inter alia*, that every corporation engaged in commerce would come within the scope of the act:

> They ought to be under the jurisdiction of this commission in order to protect the public, in order that all of their public operations should be supervised, *just the same as where a railroad company engages in work outside of that of a public carrier.  In that case such work ought to come within the scope of this commission for investigation*.
>
> . . . .
>
> [E]very corporation engaged in commerce except common carriers, and even as to them I do not know but that *we include their operations outside of public carriage regulated by the interstate-commerce acts*.

51 Cong. Rec. 8996 (1914) (emphasis added).

Although AT&T argues the purpose of the common carrier exception is to ensure that there is no agency overlap in terms of regulation, it appears that the more precise purpose was to prevent overlap between *common carrier regulations*.  As the Second Circuit observed in *Verity*, Congress created the common carrier exemption because it "did not intend the FTC to enforce unfair-competition law against common carriers because the *ICC already regulated common carriers* under the Interstate Commere Act."  *Verity*, 443 F.3d at 57 (emphasis added).  AT&T points to nothing in the legislative history suggesting that Congress intended to prevent any and all regulatory overlap (as opposed to focusing on the Interstate Commerce Commission's regulation of common carriers as

---

shall be treated as a common carrier under this Act only to the extent that it is engaged in providing telecommunications services, except that the [Federal Communications] Commission shall determine whether the provision of fixed and mobile satellite service shall be treated as common carriage").

Prior to March 12, 2015, the Federal Communications Commission deemed mobile data service a private mobile service, *i.e.*, non-common carriage.  *See Verizon v. FCC*, 740 F.3d 623, 650 (D.C. Cir. 2014) (noting that the Federal Communications "Commission has classified mobile broadband service as a 'private' mobile service" and therefore mobile broadband providers are not common carriers).  On March 12, 2015, the Federal Communications Commission issued its Reclassification Order in which it essentially reclassified mobile data service as common carriage in nature.  The Court addresses the impact of the Reclassification Order *infra*.

9

1   such).  Indeed, it is not uncommon for any particular activity of a business to be subject to multiple

2   sets of regulations.

3       That the common carrier exception in § 45(a) requires consideration of both status and

4   activity, and not just status alone, is also supported by the tool of statutory construction which

5   counsels a court to consider a statute's  "practical effects to the extent necessary to illuminate the

6   meaning of the plain language."  *Byun*, 539 F.3d at 991.  AT&T's interpretation of the common

7   carrier exception would result in significant regulatory gaps.  For example, as the FTC points out in

8   its brief,

9           AT&T's reading of the common carrier exemption would open a giant
            loophole that would threaten to swallow the FTC Act.  Companies
10          engaging in *de minimus* common carrier activity could immunize all of
            their operations from FTC scrutiny.  For example, internet giants that
11          introduce a small measure of common carrier business would be
            shielded from the FTC's active privacy and data security enforcement
12          because of their "status" as a common carrier.  Indeed, such a move
            into common carrier activities is not merely hypothetical; Google
13          recently announced its intention to become a virtual wireless carrier.

14  Opp'n at 16; *cf. Crosse & Blackwell Co. v. Fed. Trade Comm'n*, 262 F.2d 600, 604-05 (4th Cir.

15  1959) (in discussing the scope of entities exempt from § 45(a) because they are subject to the

16  Packers and Stockyards Act, noting that "Congress did not anticipate that a giant steel company

17  might attempt to escape the restraint of the antitrust laws by operating a small packing plant" and

18  thus be subject to the exemption).

19      In response, AT&T contends that any such gap has not caused an adverse effect: "If the

20  FTC's inability to regulate in these gaps were such a problem, one would imagine that Congress

21  would have stepped in at some point in the past century to address this."  Reply at 6.  But this

22  argument misses the point.  Congress would not need to step in if the common carrier exemption

23  were always understood to apply only when an entity is a common carrier and is engaging in

24  common carrier activity.  As discussed above, that indeed appears to have been Congress's

25  understanding at the time of the FTC Act's enactment.  In fact, that seems to have been the general

26  understanding of the common carrier exemption even years later, as noted by AT&T's predecessor

27  during a 1937 congressional hearing.  *See To Amend the Federal Trade Comm'n Act*, House

28  Committee on Interstate and Foreign Commerce Hearing, 75th Cong., 1st Sess. on H.R. 3143 (Feb.

United States District Court

For the Northern District of California

18-19, 1937) (AT&T's predecessor company proposing to Congress that § 45(a) be amended to include the following proviso: "provided that common carriers under the latter act are excepted as common carriers under this act only in respect of their common-carrier operations"; stating that "[a]ll this does is to make clear that so far as the fair trade practice provisions of the Federal Trade Commission Act are concerned, the exception which has always been in the act shall be preserved, and by my amendment, . . . it will make clear one thing, . . . namely, that where common carriers engage in activities that are not in the common carrier field, beyond the field that the Government is regulating, then and in that case, they are subject to the jurisdiction of the Federal Trade Commission . . . .").[5]

To the extent AT&T points out that there is no actual regulatory gap here because the Federal Communications Commission happens to regulate mobile data services under the Communications Act – albeit as non-common carriage activity (for conduct prior to the effective date of the Reclassification Order) – that is not dispositive. The point is that, under AT&T's broad interpretation of the statute, there would be regulatory gaps in many instances; AT&T has not made any showing that most or even many gaps would be filled. Moreover, that there may be some overlap between agency regulation is not damning in and of itself, particularly in the absence of any apparent conflict with respect to agency regulation.

---

[5] AT&T has argued that Congress's decision not to adopt its predecessor's proposed amendment weighs in its favor. The Court does not agree. Admittedly, the Supreme Court has stated that, "[w]here Congress includes limiting language in an earlier version of a bill but deletes it prior to enactment, it may be presumed that the limitation was not intended." *Russello v. United States*, 464 U.S. 16, 23-24 (1983). But that is hardly the situation here. Here, there was a proposed amendment that was never adopted into any version of the bill. Moreover, "[a]s a general rule, Congress'[s] rejection of a proposed amendment is not a significant aid in interpreting a statute passed years earlier." *United States v. Capital Blue Cross*, 992 F.2d 1270, 1277 (3d Cir. 1993) (citing 21 N. Singer, *Sutherland on Statutory Construction* § 48.18 (5th ed. 1992)); *see also Tahoe Regional Planning Agency v. McKay*, 769 F.2d 534, 538 (9th Cir. 1985) (stating that "caution must be exercised in using the rejection by a legislature of proposed amendments as an aid in interpreting measures actually adopted"). There are numerous reasons why legislation may not be enacted; in addition to the realities of the political process wherein legislation may not be enacted for a multitude of disparate reasons, Congress could have made a coherent choice to not enact new legislation because it believed it was already covered by law and thus not needed.

United States District Court

For the Northern District of California

AT&T contends that there would be a conflict if both the FTC and the Federal Communications Commission were to assert jurisdiction over mobile data service (as a non-common carriage service) because, in Count I,

> the FTC believes that slowing throughput speeds to customers on unlimited plans is an "unfair" practice that has "caused substantial injury" to consumers. By contrast, as long ago as 2008, the FCC affirmatively endorsed the use of such reduced speeds where, as here, a provider offering unlimited plans (Comcast) needed to manage traffic network: "Comcast has several available options it would use to manage network traffic without discriminating as it does. . . . Comcast could throttle back the connection speeds of high-capacity users (rather than any user who relies on peer-to-peer technology, no matter how infrequently)." The 2010 *Open Internet Order* likewise approved of practices involving the provision of "more bandwidth to subscribers that have used the network less over some preceding period of time than to heavier users" to reduce congestion. That order was not vacated in any respect until January 2014 (and, even then, it was vacated in part on other grounds). AT&T thus had every reason to believe during the period at issue here that conduct that the FCC preemptively approved would not later be the subject of an FTC enforcement action.

Reply at 14-15.

The problem with AT&T's position is that, even though the FTC has characterized Count I as implicating an unfair practice, the gravamen of the FTC's complaint is based on AT&T's failure to *disclose* its throttling practice to certain customers. More specifically, in Count I, the FTC asserts that AT&T's throttling program is unfair because AT&T "entered into numerous mobile data contracts that were *advertised* as providing access to unlimited mobile data, and that do not provide that [AT&T] may modify, diminish, or impair the service of customers who use more than a specified amount of data for permissible activities." Compl. ¶ 45 (emphasis added). Thus, the FTC is not arguing in the case at bar that the throttling program is unfair *per se*; instead it challenges AT&T's failure to disclose the practice to certain customers and afford them alternative options.

To the extent AT&T suggests that there could also be a conflict (either with respect to Court I or even Count II, which is the claim that characterizes AT&T's conduct as deceptive, not just as unfair) because the Federal Communications Commission has also passed its own "transparency rule, 47 C.F.R. § 8.3, which itself requires an 'accurate' disclosure," Reply at 15, the Court sees no obvious conflict between 47 U.S.C. § 8.3 & § 45(a). AT&T has pointed to no instance where a

**United States District Court**

For the Northern District of California

1  Federal Communications Commission regulation requires conduct which would violate a FTC

2  regulation or vice-versa.  *See, e.g.*, Federal Communications Commission, *In re Preserving the Open*

3  *Internet*, 25 FCC Rcd 17905, at ¶¶ 56, 57 (stating that "[w]e believe that at this time the best

4  approach is to allow flexibility in implementation of the transparency rule" and "[w]e agree that

5  broadband providers must, at a minimum, prominently display or provide links to disclosures on a

6  publicly available, easily accessible website that is available to current and prospective end users

7  and edge providers as well as to the Commission, and must disclose relevant information at the point

8  of sale").

9        AT&T protests still that "common carrier" must be viewed solely in terms of status because:

10  (1) § 45(a) repeatedly uses status-based terms, such as "persons," "partnerships," "corporations,"

11  "banks," "savings and loan institutions," "credit unions," "air carriers," and "common carrier" (as

12  opposed to common carriage) in its text; (2) § 45(a) does contain one activity-based exemption

13  which uses markedly different language, thus demonstrating that the lack of activity-based language

14  with respect to the common carrier exemption is telling; and (3) there is case law to support its

15  position.  But ultimately, none of these arguments is availing.

16        AT&T's first argument has facial appeal but is problematic based on the understanding of

17  the term "common carrier" at the time of the FTC Act's enactment in 1914 and Congress's intent to

18  encompass that understanding.

19        AT&T's second argument is based on the 1958 amendment to § 45(a).  Prior to the 1958

20  amendment, § 45(a) included an exemption related to the Packers and Stockyards Act.  More

21  specifically, that exemption existed for "persons, partnerships, or corporations subject to the Packers

22  and Stockyards Act, 1921."  52 Stat. 111 (1938).  In 1958, that exemption was amended to read

23  "persons, partnerships, or corporations *insofar as they are* subject to the Packers and Stockyards

24  Act, 1921."  27 Stat. 1749 (1958) (emphasis added).  AT&T argues that this is evidence that the

25

26

27

28

United States District Court
For the Northern District of California

Packers/Stockyards exemption used to be a status-based exemption but then, in 1958, was changed

into an activity-based exemption.[6]

The Fourth Circuit, however, has explained that this change to the Packers/Stockyards

exemption was not consequential.  More specifically, in *Crosse & Blackwell*, the Fourth Circuit

noted that, pre-amendment, it was

> clear that the substance of what was intended to be withdrawn from
> the controls of the Federal Trade Commission and subjected to
> regulation by the Secretary of Agriculture were the businesses of the
> stockyards and packers *as those industries were known and
> understood at the time*.  Doubtless the Congress did not anticipate that
> a great steel company might attempt to escape the restraints of the
> antitrust laws by operating a small packing plant, taking the position
> that it was engaged in the business of a packer and was thus subject, in
> its steel business, to regulation only by the Secretary of Agriculture
> under the Packers and Stockyards Act, or that a canner of
> miscellaneous food items might avoid compliance with the general
> antitrust laws solely by reason of the fact that it used a relatively small
> quantity of meat as an ingredient in some of its products, for it did not
> expressly provide in 1921 that one engaged in parallel business, or in
> peripheral activity, would be subject to regulation as a packer under
> the Packers and Stockyards Act to the extent that he was engaged in
> that business and subject to regulation under the general antitrust laws
> to the extent he was engaged in other businesses.  *Whatever doubt
> there may have been on that scope has been removed by the [1958
> amendment].  But if we look to the language of the Act prior to the
> 1958 amendment, in the light of the purposes the Congress in 1921
> clearly intended to serve, there seems no doubt that it was never
> intended that relatively inconsequential activity which might be
> classified as meat packing should insulate all of the other activities of
> a corporation from the reach of the Federal Trade Commission.*
>
> The language of the Act is susceptible to the construction that
> one engaged in the business of processing meats for sale is subject to
> regulation in that business as a packer under the Packers and
> Stockyards Act, while any other business in which he may be engaged

---

[6] AT&T asserts that the legislative history for the Packers and Stockyards Act shows that, before the 1958 amendment, § 45(a)'s Packers/Stockyards exemption was status based.  While the legislative history for the act does use the terms "status" and "activity," that terminology must be viewed in context.  The critical point in the legislative history was that the Packers and Stockyards Act was being amended to limit application to certain kinds of packers.  *See* H.R. Rep. No. 85-1048, at 6 (1957) (noting that the amendment to § 45(a) of the FTC Act was to reflect the amendment made in the Packers and Stockyards Act; for the amendment to the latter, "jurisdiction is predicated not upon the mere fact that a person may fall within the definition of a packer but upon the type of activity carried on by such person[;] [t]he bill limits the jurisdiction of the act and, therefore, of the Secretary of Agriculture to those commodities specifically listed in paragraph (1): 'livestock, meats, meat food products, livestock products in unmanufactured form, poultry, or poultry products'" and "[a]ctivities of packers with respect to all other products will fall under the jurisdiction of the Federal Trade Commission").

> is subject to the general restraints of that antitrust laws, and that jurisdiction to enforce the antitrust laws was left in the Federal Trade Commission, except insofar as the businesses of the stockyard and packing industry, as such, were removed from the jurisdiction of the Federal Trade Commission.

*Crosse & Blackwell*, 262 F.2d at 604-05 (emphasis added).  "A literal interpretation of the exemption . . . must be laid aside for it is 'plainly at variance with the policy of the legislation as a whole,' and if held to grant a more extensive exemption than the [Agriculture] Secretary's regulatory power would produce an absurd result."  *Id.* at 606; *see also Foxgord v. Hischemoeller*, 820 F.2d 1030, 1034 (9th Cir. 1987) (noting that "'departure from the literal construction of a statute is justified when such a construction . . . would clearly be inconsistent with the purposes and policies of the act in question'").  Hence, if anything, the legislative history of the Packers and Stockyards exemption as explained in *Crosse & Blackwell* supports the FTC's argument.  According to the Fourth Circuit, the pre-amendment language – which like the common carrier exemption contained no activity-based language (merely covering businesses "subject to" the 1921 Packers and Stockyards Act) –  nonetheless encompassed activity, not just status.

As for the third argument that case law supports its status argument, AT&T relies primarily on *Federal Trade Commission v. Miller*, 549 F.2d 452 (7th Cir. 1977).[7]  *Miller*, however, is not binding authority on this Court, and the basic reasoning of *Miller* is not persuasive.  The Seventh Circuit stated in *Miller* that it

> need not decide whether the FTC is correct in its statement that the non-carrier activities of a common carrier do not fall within the scope of the § [46] exemption.[8]  Assuming that to be correct, it does not follow that a corporation engaged solely in carrier activities steps outside the exemption whenever those activities are not of a type ordinarily regulated by the [Interstate Commerce Commission].  The

---

[7] To the extent AT&T cites other cases, those cases do not, as *Miller* did, address the exact issue of whether the term "common carrier" should be understood to include *both* a status and activities component.  *See, e.g.*, *Nat'l Fed'n of the Blind v. Fed. Trade Comm'n*, 303 F. Supp. 2d 707, 710-11, 714-15(D. Md. 2004) (noting that the FTCA applies only to corporations, not nonprofit organizations, such that there is effectively a nonprofit exemption under the act; concluding that a for-profit professional telemarketer that solicits charitable contributions for a nonprofit could be held liable under the FTCA because "an entity's exemption from FTC jurisdiction is based on that entity's status, not its activity") (emphasis omitted; citing *Miller*).

[8] Section 46 is another provision in the FTC Act.  It gives the FTC authority to investigate but, like § 45(a), also includes an exemption for common carriers.

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

> regulatory approach articulated by [the FTC], while it may be a desirable one, is not the one Congress appears to have adopted. Before the Wheeler-Lea Amendment [in 1938], [§ 45(a)(1)] of the Act had declared unlawful and [§ 45(a)(6)] of the Act had empowered the Commission to prohibit, only "unfair methods of competition in commerce." The Amendment inserted in both those subsections the *additional* words "and unfair or deceptive acts or practices in commerce." It did not, however, alter in any way the exemption provisions of the latter subsection or of [§ 46]. Thus, as amended [§ 45] declares unlawful both anticompetitive practices and unfair or deceptive acts or practices and, further, empowers the Commission to prevent persons, except regulated common carriers (and certain others), from engaging in the conduct declared unlawful. There is no conceivable basis for holding that the exception applies to one type of forbidden conduct but not the other. The Commission's argument must therefore fail, and, having failed with respect to [§ 45(a)(6)], it necessarily fails with respect to [§ 46(a)] as well.

*Id.* at 458 (emphasis added).[9]

Instead, the Court finds more persuasive the reasoning of the district court in *Federal Trade Commission v. Verity International*, 194 F. Supp. 2d 270 (S.D.N.Y. 2002), and the Second Circuit's observation on appeal. There, the FTC sued the defendant with regard to its billing practices. The defendant argued that it was a common carrier – indeed, had a license from the Federal Communications Commission to be a facilities- or retail-based international common carrier – and therefore exempt from the reach of § 45(a). The court rejected the defendant's contention, explaining that

> its argument presupposes that once the FCC licenses an entity as a common carrier, it is a common carrier for all purposes and thus entirely beyond the reach of the FTC. But that premise is fundamentally erroneous. An entity that is a common carrier may engage in a broad range of activities, some integral to its functions as a common carrier and some entirely extraneous to them. Even where Congress commits regulation of common carrier activities to a particular agency, it would make little sense to exempt a carrier's extraneous activities from laws of general application affecting the broad sweep of American business.

---

[9] The *Miller* court also questioned the FTC's contention that "Congress contemplated and intended a perfect correlation between the end sought (avoidance of inter-agency conflict) and the means adopted (the exemption) so that there would be no gap in the regulatory framework." *Miller*, 549 F.2d at 458. According to the court, "[s]ubsequent legislative history [in particular, on banks] tends to refute that assumption." *Id.* But even if Congress did not intend a perfect correlation, it is unlikely that Congress intended for there to be significant gaps.

United States District Court

For the Northern District of California

1   *Id.* at 274; *see also Computer & Comms. Industry Ass'n v. FCC*, 693 F.2d 198, 210 n.59 (D.C. Cir.

2   1982) (stating that "[i]t is clear that an entity can be a common carrier with respect to only some of

3   its activities[;] [i]n this opinion the term 'common carrier' will be used to indicate not an entity but

4   rather an activity as to which an entity is a common carrier"). The *Verity* district court

5   acknowledged *Miller* but found it to be "inconsistent with [the] common sense proposition that the

6   carrier exemption to the FTC Act should be construed no more broadly than its purpose – to avoid

7   interfering with the regulation of carriers by agencies to which their regulation is committed." *Id.* at

8   275.

9        On appeal, the Second Circuit disagreed with the district court's analysis in part, concluding

10   that "common carrier" as used in the FTCA had to be "defined by reference to the common law of

11   carriers and not to the Communications Act, even though the common law definition does not

12   meaningfully differ from the Communications Act definition for purposes of this appeal." *Verity*,

13   443 F.3d at 57. However, the Second Circuit went on to indicate that it agreed with the district court

14   that "common carrier" was predicated on both an entity's status and its activity, and not just status

15   alone. More specifically, the court noted that

16              [t]he notion of some indelible common carrier "status" under the
               Communications Act is highly questionable. *See Southwestern Bell*

17              *Tel. Co. v. FCC*, 19 F.3d 1475, 1481 (D.C. Cir. 1994) (explaining that
               "whether an entity in a given case is to be considered a common

18              carrier or a private carrier turns on the particular practice under
               surveillance" and that the FCC "is not at liberty to subject [an] entity

19              to regulation as a common carrier" if the entity is acting as a private
               carrier for a particular service"); *see also NARUC II*, 533 F.2d at 608

20              ("It is at least logical to conclude that one can be a common carrier
               with regard to some activities but not others."); *In re Audio*

21              *Commc'ns, Inc.*, 8 F.C.C.R. 8697, 8698-99, P12 (1993) ("[A] single
               firm that is a common carrier in some roles need not be a common

22              carrier in other roles.").

23   *Id.* at 60 n.4; *cf. Crosse & Blackwell*, 262 F.2d at 604-05 (interpreting pre-1958 version of Packers

24   and Stockyards Act exemption as activity based).

25        As a final point, the Court notes that two other considerations counsel in favor of the FTC's

26   interpretation over AT&T's. First, because the FTC Act is a remedial statute, it should be read

27   broadly and its exemptions narrowly. *See, e.g.*, *United States v. An Article*, 409 F.2d 734, 741 n.8

28   (2d Cir. 1969) (stating that the FTCA has a remedial purpose – *i.e.*, to protect the public, "'that vast

17

**United States District Court**

For the Northern District of California

multitude which includes the ignorant, the unthinking and the credulous'"); *In re Smith*, 866 F.2d 576, 581 (3d Cir. 1989) (noting that "[s]tatutes prohibiting unfair trade practices and acts have routinely been interpreted to be flexible and adaptable to respond to human inventiveness[;] [i]n construing section 5 of the Federal Trade Commission Act relating to unfair trade practices, for example, the Supreme Court determined that the Act was to be both broad in sweep and flexible in application"); *cf. City of Edmonds v. Wash. St. Bldg. Code Council*, 18 F.3d 802, 804 (9th Cir. 1994) (stating that "[c]ourts generously construe the Fair Housing Act" and, "[a]s a broad remedial statute, its exemptions must be read narrowly").

Second, the FTC's interpretation – although not necessarily entitled to *Chevron* deference (which the FTC disavowed at the hearing) – should still be afforded some deference pursuant to *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944) (holding that a non-controlling agency opinion may carry persuasive weight, depending on "the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control"); *see also United States v. Mead Corp.*, 533 U.S. 218, 234 (2001) (stating that "an agency's interpretation may merit some deference whatever its form").  In this regard, the Court notes that, contrary to what AT&T argues, the FTC has seemed to consistently take the position that the common carrier exemption should be viewed both in terms of status and activity, and not just status alone.  *See, e.g.*, *FTC Reauthorization*, Hearing Before the Subcommittee on Consumer Affairs, Foreign Commerce and Tourism, S. Hrg. 107-1147, at 28 (July 17, 2002) (statement of Hon. Sheila F. Anthony, FTC) (noting that "Defendants often argue that the exemption protects every action of a company that enjoys common carrier status" and that "[t]he Commission firmly believes that only the common carrier activities of such companies are exempted, but litigating this issue, as the Commission has been repeatedly forced to do, raises the cost of pursuing enforcement actions"), *available at* http://www.gpo.gov/fdsys/pkg/CHRG-107shrg91729/pdf/CHRG-107shrg91729.pdf; *Prepared Statement of the Fed. Trade Comm'n*, 2003 WL 21353573, at *19 (June 11, 2003) (statement before the Subcommittee on Commerce, Trade and Consumer Protection to support the FTC's reauthorization request for fiscal years 2004 to 2006) (stating that, "[w]hile common carriage has

United States District Court

For the Northern District of California

been outside the FTC's authority, the agency believes that the FTC Act applies to non-common-carrier services of telecommunications firms, even if the firms also provide common carrier services"); *see also FTC Amendments of 1977 and Oversight*, Hearings before the Subcommittee on Consumer Protection and Finance, 95th Cong., 1st Session on H.R. 3816, 1767, and 2483 (1977) (letter from FTC to Rep. Eckhardt) (asking for an amendment to the FTC Act, not "to extend the Commission's jurisdiction into those areas that are subject to regulation by other federal agencies, but rather, as we explained in our formal statement, . . . intend[ing] to close a 'regulatory gap' under exceptions in Sections 5 and 6 of the FTC Act *as interpreted in a recent court decision* [*i.e.*, *Miller*]") (emphasis added).  To the extent AT&T argues that the FTC has taken a different position in other lawsuits, *see* Mot. at 13, the Court does not agree.  In those cases, the FTC argued that an entity did not meet the status requirement of common carrier but it did not disavow that there was an activity component as well.

Accordingly, for all of the reasons stated above, the Court rejects AT&T's contention that the common carrier exemption in § 45(a) is predicated on status alone, and rather agrees with the FTC that § 45(a) can be applied to an entity that has the status of a common carrier so long as what is being regulated is the entity's non-common carriage services.

C.  Reclassification Order

After initial briefing was completed in this case, the parties notified the Court that the Federal Communications Commission had made the decision to reclassify mobile data service from a non-common carriage service to a common carriage service.  The Reclassification Order was released on March 12, 2015, but apparently will not go into effect until it is published in the Federal Register.  *See* Docket No. 45, at 1 n.2 (FTC's sur-reply).  The Reclassification Order expressly states that reclassification will "apply only on a prospective basis."  Reclassification Order at 134 n.792.

The FTC argues that the Reclassification Order will have minimal impact on this case because it will apply only prospectively.  In other words, the FTC focuses on the fact that, through this case, the Court can still address AT&T's *past* misconduct which allegedly violates § 45(a).  In response, AT&T contends that the FTC is missing the point – *i.e.*, once the Reclassification Order goes into effect, then the FTC will no longer have *jurisdiction* to pursue this case, even if limited to

United States District Court

For the Northern District of California

past conduct by AT&T.  *See, e.g.*, Docket No. 46, at 1 (AT&T sur-reply) (stating that "[t]he issue is whether a change to an agency's *jurisdiction* takes effect immediately and divests the agency of authority to prosecute past conduct that is the subject of pending litigation") (emphasis in original).

The FTC disputes that § 45(a) is a jurisdictional statute.  But, even assuming that it is, the Court is not persuaded by AT&T's argument.  *Hughes Aircraft Co. v. United States*, 520 U.S. 939 (1997), provides guidance as to how this issue should be resolved.

In *Hughes*, the plaintiff-whistleblower brought a qui tam action against a company for violation of the False Claims Act ("FCA").  Before 1986, qui tam suits were barred if the information on which they were based was already within the government's possession.  In 1986, there was an amendment to the FCA which partially removed that bar.  The question for the Supreme Court was whether that amendment applied retroactively to the plaintiff's suit.  The Supreme Court held that the 1986 amendment was not retroactive and therefore the plaintiff's action was barred.  *See id.* at 941-42.

One of the arguments made by the plaintiff in favor of retroactivity was that the 1986 amendment was "jurisdictional, and hence . . . an exception to the general *Landgraf* presumption against retroactivity."  *Id.* at 950.  The Supreme Court noted first that "[t]he fact . . . courts often apply newly enacted jurisdiction-allocating statutes to pending cases merely evidences certain limited circumstances failing to meet the conditions for our generally applicable presumption against retroactivity, not an exception to the rule itself."  *Id.* at 951.  The Court then went on to note that

> [a]pplication of a new jurisdictional rule usually 'takes away no substantive right but simply *changes* the tribunal that is to hear the case.'  Present law normally governs in such situations because jurisdictional statutes 'speak to the power of the court rather than to the rights or obligations of the parties.'"
>
> Statutes merely addressing *which* court shall have jurisdiction to entertain a particular cause of action can fairly be said merely to regulate the secondary conduct of litigation and not the underlying primary conduct of the parties.  Such statutes affect only *where* a suit may be brought, not *whether* it may be brought at all.
>
> The 1986 amendment, however, does not merely allocate jurisdiction among fora.  Rather, it *creates* jurisdiction where none previously existed; it thus speaks not just to the power of a particular court but to the substantive rights of the parties as well.  Such a

20

statute, even though phrased in "jurisdictional" terms, is as much subject to our presumption against retroactivity as any other.

*Id.* (emphasis in original).

Here, even if the change to the common carrier exception, resulting from the Reclassification Order, could be deemed a change in tribunal (*i.e.*, because enforcement with respect to mobile data would be delegated to the Federal Communications Commission instead of the FTC and this Court would have jurisdiction only in the former instance), the fact remains that substantive rights are affected by that change as well. As the FTC explains out in its sur-reply:

> According to AT&T, the FCC is poised to sanction AT&T for its throttling program. FCC action is not, however, a substitute for the relief sought by the FTC. *The FCC is not authorized to seek refunds for injured consumers, and its enforcement authority is limited to conduct going back one year.* 47 U.S.C. § 503(b)(6). AT&T's throttling program has been in effect for more than three years, and has, over the course of that time, inflicted economic harm on millions of customers.

FTC Sur-Reply at 5 n.5 (emphasis added). This impairment of substantive rights (and AT&T's liability) is comparable to that in cases such as *Matthews v. Kidder, Peabody & Co.*, 161 F.3d 156, 157, 166 & n.17 (3d Cir. 1998) (holding that amendment to Private Securities Litigation Reform Act, which eliminated securities fraud-based RICO claims, was not retroactive; also indicating that there be no retroactivity for, *e.g.*, an amendment that reduced the statute of limitations under RICO or that eliminated treble damages under RICO), and *Mabary v. Home Town Bank, N.A.*, 771 F.3d 820, 826 (5th Cir. 2014) (stating, that before the amendment to the Electronic Funds Transfer Act, the plaintiff "had a cause of action based upon [the defendant's] alleged actions, but afterward she would not" and "the amendment thus 'may be seen as destroying a cause of action and impairing a party's rights'"). As in *Matthews*, the applicable limitation period would effectively be shortened given the Communications Act's one-year limitations period. Moreover, as in *Mabary*, the remedy of refunds to injured consumers sought by the FTC (but not available to the Federal Communications Commission) would be impaired.

The authority that AT&T cited in its papers and at the hearing is unavailing. For example, in *Duldulao v. INS*, 90 F.3d 396 (9th Cir. 1996), the Ninth Circuit simply indicated that deprivation of

United States District Court

For the Northern District of California

1    judicial review in the immigration context (more specifically, judicial review of deportation orders

2    involving aliens convicted of firearms offenses) merely affected the power of the court and not the

3    rights or obligations of the parties.  *See id.* at 398-99 (noting that, "[a]s a general rule, we presume

4    that statutes affecting substantive rights or obligations apply prospectively only" and that "[t]his

5    presumption applies when a new statute impairs rights a party possessed when he acted, increases a

6    party's liability for past conduct, or imposes new duties with respect to transactions already

7    completed"; adding that "[a] jurisdictional statute usually takes away no substantive right but simply

8    changes the tribunal that is to hear the case" – such statutes "*speak to the power of the court* rather

9    than to the rights or obligations of the parties") (emphasis added; internal quotation marks omitted).

10          As for *Southwest Center for Biological Diversity v. United States Department of Agriculture*,

11   314 F.3d 1060 (9th Cir. 2002), there, the plaintiff brought suit after failing to get a response to a

12   request for information pursuant to the Freedom of Information Act ("FOIA").  While the action was

13   pending, Congress enacted the 1998 Parks Act, which included a provision allowing for a

14   withholding of information in response to a FOIA request.  The district court applied that provision,

15   which led the plaintiff to argue on appeal that the district court had given impermissible retroactive

16   effect to the Parks Act provision.  The Ninth Circuit disagreed, rejecting the plaintiff's contention

17   that the Parks Act provision impaired a right it possessed when it acted because it had a right to the

18   information when it filed its suit and then lost that right by application of the exemption.  *See id.* at

19   1062.  The court explained: "[T]he 'action' of the [plaintiff] was  merely to request or sue for

20   information; it was not to take a position in reliance upon existing law that would prejudice the

21   [plaintiff] when that law was changed."  *Id.*  The Ninth Circuit also noted that "application of the

22   exemption furthers Congress's intent to protect information regarding threatened or rare resources of

23   the National Parks" and thus "[t]his case . . . presents one of the many situations in which courts

24   appropriately apply the law in existence at the time of their decision."  *Id.*  Here, the action taken by

25   the FTC is not comparable to a mere FOIA request; what is at stake is not simply a request for

26   information, but substantive rights directly affecting financial interest.  In this case, the FTC took a

27   substantive position in reliance upon existing law that would prejudice it, as well as the public on

28

whose behalf it acted, when that law was changed – and notably, not by Congress directly but rather by a sister agency.

### III.   CONCLUSION

For the foregoing reasons, the Court denies AT&T's motion to dismiss.  Contrary to what AT&T argues, the common carrier exception applies only where the entity has the status of common carrier and is actually engaging in common carrier activity.  When this suit was filed, AT&T's mobile data service was not regulated as common carrier activity by the Federal Communications Commission.  Once the Reclassification Order of the Federal Communications Commission (which now treats mobile data serve as common carrier activity) goes into effect, that will not deprive the FTC of any jurisdiction over *past* alleged misconduct as asserted in this pending action.

This order disposes of Docket No. 29.

IT IS SO ORDERED.

Dated:  March 31, 2015

_____
EDWARD M. CHEN
United States District Judge